In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3022

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CAMERON PATTERSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:13-cr-00065-TLS-SLC-2 — **Theresa L. Springmann**, *Judge.*

ARGUED APRIL 19, 2016 — DECIDED JUNE 14, 2016

Before BAUER, POSNER, and FLAUM, *Circuit Judges.*

BAUER, *Circuit Judge.* *Miranda* warnings have taken a foothold in American culture largely via crime drama television and film. Defendant-appellant, Cameron E. Patterson, argues Federal Bureau of Investigation agents violated his Fifth Amendment right against self-incrimination when they failed to give him *Miranda* warnings prior to interviewing him. The sole issue is whether Patterson was "in custody" when he made his incriminating statements, thereby implicating the

Fifth Amendment and necessitating *Miranda* warnings. We find Patterson was not in custody for purposes of *Miranda*, and therefore affirm the district court's order denying the motion to suppress his statements.

## I. BACKGROUND

On May 29, 2013, the PNC Bank in Ossian, Indiana, fell victim to an armed robbery. FBI Special Agent Stewart was assigned to investigate the robbery and determined Patterson to be a suspect. Stewart provided FBI task force officers with a list of addresses for Patterson. On July 23, 2013, FBI Task Force Officer Strayer checked some of the addresses and found Patterson at one: 4761 Holton Avenue. Strayer also saw a white Dodge Magnum that, according to information developed through the investigation, may have been purchased with the robbery proceeds, and saw Patterson enter and exit the residence twice and walk north along the street. Strayer called Stewart and told him of what he had seen.

The agents came up with a plan to approach Patterson. Stewart drove to the residence in a green, unmarked Ford Taurus; Strayer was in a dark colored, unmarked van. They found Patterson standing in a driveway between 3409 and 3417 Holton. Stewart parked his Taurus on one side and Strayer parked his van on the other side of 3409 Holton.

Both Strayer and Stewart were wearing casual street clothes; neither officer was in a uniform, but they were both armed. Each agent had a handgun holstered on his waist underneath his untucked shirt. Strayer got out of his van, announced himself as FBI, and asked Patterson two or three times to show his hands. As he was approaching Patterson,

Strayer had his hand on his gun which remained in its holster. Stewart got out of his car, walked over to Patterson and Strayer, and showed Patterson his FBI credentials. Stewart explained to Patterson that his name came up in an investigation. When Patterson inquired about the investigation, Stewart said he did not want to discuss the details in the driveway. He then asked Patterson if he would be willing to go to Stewart's office to discuss the issue and "clear his name." Patterson said he was willing to talk with the agents.

The agents and Patterson walked from the driveway to the passenger side of Stewart's car. Stewart asked Patterson if he had any weapons on him. Stewart then said, "Hey, just for officer safety reasons, let me just do a quick check." At that point, Patterson placed his hands spread out on top of Stewart's car and spread his legs, assuming a search-type stance. Stewart told Patterson not to do that because he did not want to "make a big scene out here." Stewart wanted to keep the interaction "low key," without attracting a lot of attention from passersby. Stewart told Patterson to get out of his search stance and asked him to raise his shirt so he could see his waistband. Patterson raised his shirt, showing the agents his waistband. Stewart performed a quick pat down of Patterson's outer pockets. Patterson lowered his shirt.

Stewart opened the front passenger door for Patterson. Stewart asked, "I just want to make sure you're voluntarily coming with us, correct?" Patterson responded in the affirmative. Patterson got into the front passenger seat of the car. Stewart got in the driver's seat. All of these events occurred in approximately three or four minutes.

Strayer drove his van to nearby Irwin Elementary because he did not want to leave his van parked on Holton. Strayer parked his van at the school and got into the backseat of Stewart's car, directly behind Patterson. On the way to the FBI office, located on the tenth floor of the First Source Bank Building at 200 East Main Street, the three engaged in small talk. Strayer drove his car into the public garage of the building and parked in a reserved spot. The three men took the public elevator up to the tenth floor. After exiting the elevator, the men walked down a hallway, past a law office that shares the floor with the FBI and to the front door of the FBI office. This front door was locked from the outside, but unlocked from the inside. It had a typical push bar to exit. To open the door, one of the agents swiped a keycard and punched a code into a keypad.

Immediately inside and to the left of the front entrance was a conference room. Like the front door, the conference room door was locked from the outside and unlocked from the inside. To enter the room, one of the agents swiped a keycard. The conference room door had a regular handle to exit. Inside the conference room was a rectangular table with chairs around it and miscellaneous office equipment stored along the walls. Patterson sat in a chair closest to the door with the door located at his "two o'clock" position. Stewart sat across from Patterson, on the side of the table away from the door, and Strayer sat near Stewart at a corner of the table. Stewart took notes. There was nothing between Patterson and the conference room door.

Although Stewart portrayed the interview as an opportunity for Patterson to "clear his name," Stewart intended to ask Patterson questions designed to illicit incriminating responses.

When asked about the bank robbery, Patterson denied any involvement and provided an alibi. Stewart accused Patterson of having been involved in the robbery. Stewart assured Patterson he could speak freely, as he was not going to be arrested that day. At the suppression hearing, Stewart could not recall the exact words he used, but he told Patterson something to the effect of: "[u]nless you tell me you murdered someone or something, that rose to that level of a crime, you're not going to be under arrest today." Patterson then confessed his and his cohorts' involvement in the robbery.

At the end of the interview, which lasted about two hours, Patterson asked about when they thought he would be arrested, as he had a family and wanted to get his affairs in order. Stewart told Patterson that an arrest warrant would likely be secured in a week or two. Patterson provided his phone number to Stewart and agreed to turn himself in. Stewart advised Patterson he would have time before he had to turn himself in, but that the time was limited. The agents offered to give Patterson a ride back, which Patterson accepted. The agents dropped Patterson off at his requested location.

At the time of Patterson's interview, the conference room was not equipped with recording equipment. The FBI's default policy was to not record interviews. If an agent wanted to record an interview, he or she had to obtain special permission to record in advance of the interview. In Patterson's case, Stewart did not seek advance approval to record the interview

because he did not know in advance that the interview was going to occur. The plan for the day was to check the addresses and conduct some surveillance. Stewart did not know if they would even see Patterson, let alone whether Patterson would agree to speak with them. Stewart knew he did not have probable cause to arrest Patterson at that point, and that if Patterson did not agree to speak with the agents, Stewart would have walked away and no information would be obtained.

Patterson moved to suppress the incriminating statements that he contends were made in violation of *Miranda*. It is undisputed that no *Miranda* warnings were given prior to Patterson's interview. The district court denied Patterson's motion, finding he was not in custody for purposes of *Miranda*. Patterson pleaded guilty to violations of 18 U.S.C. § 2113(a) and (d), armed bank robbery and assault with a dangerous weapon, and a violation of 18 U.S.C. § 2, aiding and abetting of same, but preserved his right to appeal the district court's denial of his motion to suppress.

## II. DISCUSSION

In the seminal case of *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court also delineated those "procedural safeguards," which have come to be commonly known as *Miranda* warnings. *Id.* These warnings are not required in

every instance of questioning by law enforcement. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (warnings not required "simply because the questioning takes place in the [police] station house, or because the questioned person is one whom the police suspect"). To implicate *Miranda*, the suspect must be in custody, and the suspect must be subjected to interrogation. *Miranda*, 384 U.S. at 444, 445, 457; *Berkemer v. McCarty*, 468 U.S. 420, 437–38, 440 (1984).

In this case, it is undisputed that Patterson was subjected to interrogation; Stewart testified that he intended and did in fact ask Patterson questions designed to illicit an incriminating response. *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012) (citations omitted). Therefore, our inquiry is limited to whether Patterson was "in custody" at the time of the interview at the FBI office. We review the district court's determination that Patterson was not in custody *de novo* and the district court's factual findings for clear error. *Id.* at 955 (citation omitted). In this case, Patterson does not dispute and we find no clear error with any of the district court's factual findings. Thus, we apply the law to the facts as determined by the district court.

"A person is 'in custody' for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest." *Id.* at 954 (citations omitted). To determine whether Patterson was in custody, we use the objective test of whether a reasonable person under the same circumstances as Patterson would have felt free to leave. *Yarborough v. Alvarado*, 541 U.S. 652, 662–63 (2004); *Ambrose*, 668 F.3d at 954–55 (citations omitted); *United*

*States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006) (citation omitted). For Patterson to establish he was in custody at the time of his incriminating statements, he "must show that he … was formally arrested, or that he … was subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990) (citations omitted). *See also*, *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011); *Ambrose*, 668 F.3d at 955. Because Patterson was not formally arrested, this case falls into the latter "restraints of freedom" analysis: whether a reasonable person in Patterson's position would have believed he or she was free to leave.

In determining whether a reasonable person in the suspect's shoes would have felt free to leave, we consider "all of the circumstances surrounding the interrogation." *Howes v. Fields*, – U.S. –, 132 S. Ct. 1181, 1189 (2012) (citation omitted, internal quotation marks omitted). Factors relevant to the totality of the circumstances analysis include: (1) the location of the interrogation; (2) the duration of the interrogation; (3) any statements made by the suspect during the interrogation; (4) any use of physical restraints during the interrogation; and (5) whether the suspect was released at the end of the interrogation. *Howes*, 132 S. Ct. at 1189 (cataloging cases; citations omitted). We have provided a non-exhaustive list of example factors, which includes: "whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a

display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011), *citing United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011). *See also, United States v. Wyatt*, 179 F.3d 532, 535 (7th Cir. 1999), *citing United States v. Yusuff*, 96 F.3d 982, 985–86 (7th Cir. 1996).

Patterson was not in custody based on a totality of the circumstances, as his freedom of movement was not curtailed similar to that of a formal arrest. One major factor that is weighed in ascertaining whether or not the subject is in custody is the location of the interrogation. This includes whether the interrogation occurred in a public place and whether he was moved from one location to another. The initial contact between the agents and Patterson occurred in a public setting: a driveway on a public street. The agents drove Patterson to the FBI office; Patterson was moved from one location (the driveway) to another location (the FBI office conference room). Agent Stewart parked his car in a public parking garage, and the three men walked into the office building, which was open to the public. They took the elevator to the tenth floor and walked to the FBI office, which is a private space. The interrogation occurred in a conference room and lasted approximately two hours. The fact that the interrogation took place in the FBI office conference room does not by itself establish custody. *See Mathiason*, 429 U.S. at 493–94, 495 (no custody found for purposes of *Miranda* where suspect went to state police patrol office voluntarily, interrogation conducted in an office, and suspect released at conclusion of interrogation).

Patterson went to the FBI office voluntarily. Before they got into Stewart's car, Stewart double-checked by asking Patterson: "I just want to make sure you're voluntarily coming with us, correct?" Patterson agreed. Patterson's voluntariness over-comes the fact that he was moved from the driveway to the FBI office. *See United States v. Ruiz*, 785 F.3d 1134, 1145 (7th Cir. 2015) ("custodial aspect" of suspect being moved from drive-way to police station "mitigated by the fact that [the suspect] consented to the relocation").

Patterson argues that the agents' use of a "ruse" renders his agreement to go with the agents involuntary. According to Patterson, the "ruse" occurred when Stewart asked Patterson if he wanted to "clear his name" vis-a-vis their investigation. A law enforcement officer's subjective beliefs about whether an individual is a suspect or not, or is in custody or not, are generally irrelevant to the custody determination for *Miranda* purposes. *United States v. Stewart*, 536 F.3d 714, 720–21, (7th Cir. 2008) (citation omitted); *Ambrose*, 668 F.3d at 954. Further, Patterson's case is distinguishable from cases where a "ruse" negated a suspect's volition. *Cf. Ambrose*, 668 F.3d at 950–51, 956 (suspect's voluntariness in appearing at FBI building negated by suspect's supervisor, working in cahoots with the FBI, instructing suspect to report to FBI building for work purposes). Here, there was no "ruse." The agents told Patterson that they wanted to talk to him about their investiga-tion. They did not fabricate a fictitious reason for Patterson to go to the FBI office with them. When told that they wanted to discuss their investigation and give Patterson an opportunity to "clear his name," a reasonable person in Patterson's shoes would have or should have known that any ensuing discussion

or interview would be about the FBI investigation and Patterson's involvement in the subject of the investigation. Stewart telling Patterson it was his opportunity to "clear his name" implies that his name might not be "clear" and that he was implicated in illegal activity. Stewart's statement does not overcome or negate Patterson's voluntariness in going with the agents to the FBI office; Patterson was told the true reason (the FBI investigation) for the interview.

Patterson also argues he was "not free to leave" Stewart's moving car on the drive to the FBI office. But this fact does not establish custody. The restriction of Patterson's movement by being in a moving car is mitigated by the fact that he agreed to accompany the agents voluntarily. *See United States v. Podhorn*, 549 F.3d 552, 556 (7th Cir. 2008) ("fact that [suspect] was not free to leave the car once it was in motion (as is always true of any rider in any car driven by any party) is not relevant because the evidence indicates that he voluntarily agreed to ride in [the law enforcement] car," one factor in finding no custody for *Miranda* purposes).

Patterson also argues that his initial encounter with the agents was "absolutely confrontational," emphasizing that the agents were armed. This, Patterson argues, makes his actions involuntary. However, the fact that the agents were armed does not weigh in favor of custody. It is reasonable to assume that all law enforcement personnel who are on duty and actively investigating crime are armed. Thus, simply being armed does not raise the threat or confrontation level by law enforcement. That the agents did not draw or actively use their weapons to assert authority over Patterson weighs against custody. *Cf. United States v. Slaight*, 620 F.3d 816, 818, 820 (7th

Cir. 2010) (custody found, show of force one factor, where nine or ten officers served search warrant on suspect's home at 7:45 a.m. by battering down suspect's door, yelling, weapons, including assault rifles, drawn).

At most, the initial contact—from the driveway to getting into Stewart's car—was akin to a *Terry* stop. Stewart approached Patterson first, with his hand on his gun, telling Patterson to show his hands, and identified himself as FBI. Patterson complied and showed his hands. After they walked to the car, Stewart performed a modified pat down of Patterson, a suspected armed bank robber, to ensure he did not have any weapons. A *Terry* stop does not constitute custody for *Miranda* purposes. *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop … does not constitute *Miranda* custody") (citations omitted). Furthermore, we have repeatedly held that a pat-down search does not establish custody for *Miranda* purposes. *See e.g.*, *Wyatt*, 179 F.3d at 537 (citation omitted).

Of course, we do not consider the driveway-to-office encounter in isolation. Arguably, the FBI conference room was a private space, but this factor has minimal weight in considering the totality of circumstances. Patterson was never restrained while in the conference room. The front door to the FBI office and the door to the conference room remained unlocked from the inside and could be exited via common door handles. *See Ambrose*, 668 F.3d at 957 (in finding no custody, law enforcement "used a spacious conference room" for interview, "room itself did not physically prevent [sus-

pect's] exit, nor did it suggest that he was under arrest"). Patterson stresses that access to the FBI office was limited by a card-reader and a keypad and access to the conference room was limited by another card-reader. We have rejected similar arguments; security measures that are universally applied to the public and employees do not render a space or interaction custodial. *Id.* at 956–57 (where at entrance of FBI building, per general security measures, suspect "was required to relinquish any weapons, cell phones, keys, and similar items before entering," such security measures "are not indicative of custody to a reasonable person because [they] were uniformly applied"); *United States v. Budd*, 549 F.3d 1140, 1146 (7th Cir. 2008) (finding of no custody for *Miranda* purposes, where security measures such as entry to police station where suspect was interviewed required use of buzzer for admittance, elevator required use of magnetic security card for operation, and secure bathroom where occupant could not open door or flush toilet, "not extraordinary circumstances" given suspect agreed to meet detective at police station).

Patterson made no statements in the car or during the interrogation that indicated involuntariness on his part. He never requested Stewart to stop the car so he could get out and never said he wanted to stop the interrogation or that he did not want to answer the agents' questions. He never said anything that indicated he did not want to speak with the agents.

Further, Stewart told Patterson that he was not going to be arrested that day, saying something to the effect of: "[u]nless you tell me you murdered someone or something, that rose to that level of a crime, you're not going to be under arrest

today." Here, Patterson stresses the agents never explicitly told him he was not under arrest or that he was free to leave. But this argument cuts both ways; Patterson was never told he *was* under arrest. *Wyatt*, 179 F.3d at 536 (suspect never told he was under arrest one factor in finding no custody for purposes of *Miranda*). Though the agents may not have used the exact words "you are not under arrest," that message was conveyed to Patterson. Stewart encouraged Patterson to speak freely because he would not be arrested that day. The agents never told Patterson he was under arrest or that he was not free to leave, and they never placed him in handcuffs or restrained him in any other physical way which commonly effects an arrest. Patterson's understanding of the information conveyed to him is further bolstered by the fact that at the end of the interrogation, Patterson asked the agents when he would be arrested (showing he knew he was not under arrest) and they made arrangements for Patterson to turn himself in once a warrant issued. A reasonable person in Patterson's shoes would have understood he was not under arrest.

We next consider the agents' actions: whether physical restraints were used; whether there was a threatening presence of agents and use of weapons; and whether their tone of voice was "such that their requests were likely to be obeyed." *Littledale*, 652 F.3d at 701 (citation omitted). Physical restraints were never used. The agents never used their weapons. Although Strayer had his hand on his gun for a matter of seconds, neither agent ever drew their gun or used it. There were only two agents. They did not ambush him, yelling orders, in full uniform or SWAT-type fatigues with weapons drawn. *Cf. Slaight*, 620 F.3d at 818, 821. There were no "threat-

ening statements or gestures." *Podhorn*, 549 F.3d at 556. The agents simply walked up to Patterson, informed Patterson they were FBI, and asked Patterson to show his hands and if he had any weapons. When Patterson said no, they began talking about the investigation. The agents then walked with Patterson to Stewart's car. At this point, Stewart asked Patterson if he had any weapons on him and performed a modified pat down on Patterson to ensure the agents' safety. The agents purposefully kept the interaction "low key," and there is no evidence to suggest the agents used voices compelling compliance by Patterson, such as yelling, using profanities, threatening arrest, *etcetera*.

Finally, Patterson left after the interrogation, which weighs against a custody finding. Also weighing against custody is the fact that Patterson and the agents had a conversation about the issuance of the warrant for Patterson's arrest and how much time Patterson had to get his affairs in order. Patterson even made arrangements with the agents to turn himself in once an arrest warrant issued. Then the agents gave him a ride to his choice destination. Although we recognize that Patterson's subjective understanding is irrelevant in our determination of custody, his actions and words do bear on the overall atmosphere of the entire interaction and how that atmosphere "would impact a reasonable person's perception." *Ambrose*, 668 F.3d at 659 (suspect's statements regarding need to be punctual for child's parent-teacher conference later in day after interview one factor in finding of no custody). A reasonable person in Patterson's situation would have believed he was not under arrest and was free to leave.

Considering the totality of the circumstances, from the beginning of the encounter in the driveway to the end of the interrogation when Patterson walked out of the FBI office, Patterson was not in custody for purposes of *Miranda*. As the Supreme Court noted, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495. But not all interactions implicate *Miranda*. In this case, all of the circumstances of the interaction, from beginning to end, do not rise to the level of having restrained Patterson's freedom of movement akin to a formal arrest. Nothing in the record shows Patterson's consent to accompany the agents to the FBI office and his consent to speak with them was anything but voluntary. A reasonable person in Patterson's position would have felt free to leave. Patterson's interaction with the FBI agents "had no indicia of compulsion or government overreaching, such as violence, threats, promises, or unduly protracted interrogation." *Podhorn*, 549 F.3d at 557. Therefore, the district court did not err in denying Patterson's motion to suppress his incriminating statements.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court.