In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-3102

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

JORGE L. LEAL,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 19-CR-40069-JPG-1 — **J. Phil Gilbert**, *Judge.*

ARGUED MAY 18, 2021 — DECIDED JUNE 21, 2021

Before EASTERBROOK, BRENNAN, and SCUDDER, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Jorge Leal used an online dating application to solicit sex acts from a user he believed was an underage boy. That user turned out to be a Federal Bureau of Investigation agent conducting a sting operation. In an interview with law enforcement, Leal confessed. He was then arrested and charged with knowingly attempting to entice a minor to engage in sexual activity, in violation of 18 U.S.C.

§ 2422(b). Leal moved to suppress his incriminating state-
ments, arguing that the agents failed to provide a *Miranda*
warning before the interview. The district court granted the
motion, and the government filed this interlocutory appeal.
Because Leal was not "in custody" during the interview, we
reverse.

**I**

In July 2019, Jorge Leal contacted a user on Grindr, an
online dating application.[1] Unknown to Leal, that user was an
undercover FBI agent looking to identify and locate individu-
als who have a sexual interest in children. The agent, posing
as a teenage boy, informed Leal that he was 15 years old. De-
spite learning that the user was underage, Leal continued to
engage in sexually explicit conversations and eventually so-
licited oral sex. A week after the initial conversation, Leal
asked the user for his location. The agent provided Leal the
address of a house in Herrin, Illinois, that the FBI was using
for the operation.

Leal arrived at the house on the evening of July 19. An FBI
surveillance team watched Leal drive around the block and
stop in an alley behind the house. Wary of a potential trap,
Leal asked the supposed minor to flick on the outside lights
to the house. When one of the surveillance team officers, U.S.
Marshal Clark Meadows, drove an unmarked vehicle up the
alley, Leal sped off but did not get far. Meadows pulled Leal
over approximately two blocks from the house.

---

[1] We draw the facts from the indictment, parties' briefs, suppression
hearing transcript, and district court's memorandum and order.

Three law enforcement agents were present during the stop. Meadows wore a green tactical vest with a badge and "U.S. Marshal" written across the front and back. The other two—FBI special agent Adam Buiter and a local police officer—each wore plain clothes under a vest with the words "Police" displayed across the front and back. Buiter identified himself as an FBI agent and asked Leal if he would step out of the car. Leal agreed, exited the vehicle, and consented to a pat down during which Buiter retrieved Leal's wallet. When Buiter asked Leal if he had a cellphone, Leal pointed to it and handed it over. Buiter next explained to Leal that he was not under arrest and that he was stopped as part of an ongoing investigation. Buiter asked whether Leal would voluntarily consent to speak with other agents in a nearby house, and Leal said "yes." Before leaving, Buiter asked Leal for his car keys so an agent could move his car off the road to a nearby parking lot. Again, Leal consented and handed over his keys.

Meadows then drove Leal back to the house. There, another FBI agent escorted Leal through the back door. Leal passed the kitchen, where he encountered at least two other law enforcement personnel, before arriving at a first-floor bedroom. Two new FBI agents waited inside the room, which contained a table, three chairs, and a computer. They set Leal's wallet and cellphone on the table; his car keys remained with law enforcement. Leal agreed to the interview, which proceeded with the door closed and was audiotaped. The agents neither handcuffed nor restrained Leal during this entire episode.

Leal quickly confessed. After explaining to Leal that the interview was informal and that they are "just going to have a conversation," the agents began by asking, "What brings

you out this way?" Within two minutes, Leal admitted to driving to the house after "chatting with a younger male through the Grindr app." A few minutes later, an agent asked, "What was the point of you coming here tonight?" Leal then admitted that he came to the house "to play around sexually" with and receive oral sex from a minor. Leal also confessed that he knew showing up to meet with a fifteen-year-old was wrong, but he did so anyway. Only after Leal's confession did the agents read aloud the Grindr chat log containing Leal's solicitation messages. Leal confirmed he had sent these messages. At the end of the interview, which lasted approximately eighteen minutes, the FBI arrested Leal.

In August 2019, a grand jury indicted Leal for knowingly attempting to entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b). Leal moved to suppress his statements in the interview, arguing that the agents conducted a custodial interrogation without advising him of his Fifth Amendment rights. Applying the totality-of-the-circumstances test of *Howes v. Fields*, 565 U.S. 499 (2012), the district court concluded that Leal was "in custody" for purposes of *Miranda* and granted his motion to suppress.

## II

The government filed this interlocutory appeal, challenging the district court's grant of the motion to suppress. We have jurisdiction under 18 U.S.C. § 3731. On a grant of a motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error. *See United States v. Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021).

The Fifth Amendment protects individuals from self-incrimination. U.S. CONST. amend. V. Before conducting a

custodial interrogation, law enforcement officers must inform suspects of their constitutional right to remain silent and to have counsel present. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). But the officers need not provide *Miranda* warnings unless the suspect is both "interrogated" and "in custody." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). In other words, "[a]n interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011) (quoting *Miranda*, 384 U.S. at 444). To establish that he was in custody at the time of the questioning, a defendant must show that he was either "formally arrested" or "subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) (internal quotation marks omitted). A person who is "free to end the interrogation and leave is not in custody." *United States v. Higgins-Vogt*, 911 F.3d 814, 820 (7th Cir. 2018) (citing *Howes*, 565 U.S. at 509).

Determining whether a person is "in custody" is an objective inquiry. *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). Courts must ascertain whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (alteration in original) (internal quotation marks omitted). The "only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation," *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), in light of "all of the circumstances surrounding the interrogation." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam). Relevant factors include: the location of the questioning; its duration; statements made during the interview; the presence or absence of physical

restraints during the questioning; and the release of the interviewee at the end of the questioning. *Howes*, 565 U.S. at 509.

An individual's subjective beliefs are irrelevant in a *Miranda* custody determination. *See Stansbury*, 511 U.S. at 323; *see also Stechauner v. Smith*, 852 F.3d 708, 715 (7th Cir. 2017) ("Because custody is determined by an objective standard, the subjective beliefs of the suspect and police officers are irrelevant."). The Supreme Court has explained that the custody inquiry "involves no consideration of the 'actual mindset' of the particular suspect subjected to police questioning." *J.D.B.*, 564 U.S. at 271 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004)). And for good reason: "the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." *J.D.B.*, 564 U.S. at 271. True enough, "the line between permissible objective facts and impermissible subjective experiences can be indistinct in some cases." *Alvarado*, 541 U.S. at 667. But, where possible, courts must draw the distinction. A subjective inquiry looks to the individual's idiosyncrasies, such as the suspect's own beliefs about the situation or his state of mind, that may impact how they perceive the questioning. *See United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012). The objective test instead focuses on how a reasonable person would have perceived the events. *Howes*, 565 U.S. at 509.

Whether we review this case under our court's decision in *Patterson*, or independently under the *Howes* factors, we conclude that Leal was not in custody while the agents interviewed him.

In *Patterson*, FBI agents identified the defendant as a suspect involved in a bank robbery. 826 F.3d at 452. Two agents—

dressed in casual clothes and each armed with a handgun—approached the defendant in his driveway. *Id.* They identified themselves as FBI agents, asked the defendant to show his hands, and explained that "his name came up in an investigation." *Id.* When the agents requested a pat down and an interview, the defendant voluntarily consented to both and accompanied the agents to an FBI office located on the tenth floor of a downtown building. *Id.* at 453. During the two-hour interview inside a conference room, which was unlocked from the inside, he confessed his involvement in the robbery. *Id.* The defendant later moved to suppress his incriminating statements, asserting the agents failed to provide *Miranda* warnings. *Id.* at 454.

Affirming the denial of the defendant's suppression motion, this court in *Patterson* emphasized that the totality of the circumstances militated against suppression. *Id.* at 459. There, the agents did not physically restrain the defendant, threaten him to induce compliance, or tell him he was under arrest or was not free to leave. *Id.* at 458. The defendant also did not make any "statements in the car or during the interrogation that indicated involuntariness on his part." *Id.* at 457. That the agents conducted the interview in a private FBI conference room, this court held, had "minimal weight in considering the totality of circumstances." *Id.* This was especially true because the defendant was never restrained inside the conference room and the door remained unlocked from the inside, suggesting that he remained free to walk out of the interview. *Id.*

The district court here distinguished *Patterson* but did so by infusing Leal's subjective beliefs into the totality-of-the-circumstances evaluation. First, the court found that the location of the interview favored suppression because it "occurred

outside public purview" and in a "police-dominated atmosphere of the home," which it described as "outfitted like a makeshift police station." To distinguish these facts from those in *Patterson*, in which the agents approached an unsuspecting defendant in his driveway, the district court here emphasized that Leal was "'caught in the act,' making it less reasonable to think that he could turn his back on the officers." As to the statements made, the court pointed to Leal's request to flick on the lights once he first drove up the alley and his prompt confession once the questioning began. These circumstances, the court explained, suggested that Leal "did not think that he was going home a free man from the onset." Then, citing a nonprecedential District of Columbia Court of Appeals opinion, the district court concluded that Leal "could reasonably have assumed that he would not be allowed to leave" after he was confronted with "obvious evidence of [his] guilt." (alteration in original) (quoting *Miley v. United States*, 477 A.2d 720, 722 (D.C. 1984)).

Contrary to the district court's reasoning, a suspect's guilty conscience does not turn every police encounter into a custodial interrogation. *See United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008) (noting that the custody inquiry "is not whether the defendant was under a subjective belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave" (internal quotation marks omitted)). The district court, in evaluating the locations factor, emphasized that Leal felt obliged to stay because he was caught in the act. But this rationale focuses on Leal's state of mind rather than looking at what a reasonable person would have done in that situation. That Leal believed he was in a precarious position from the moment he drove up the alley says nothing

about the behavior of the officers or whether a reasonable person would have felt bound to stay. The same is true for the district court's discussion of Leal's statements. The court emphasized his quick confession, including his statement that he knew "it was wrong from the very beginning," to demonstrate that Leal believed he was not free to leave. This too skirts the objective inquiry—here, whether a reasonable person would have confessed two minutes into the interview—by viewing the statements through the lens of Leal's guilty conscience.

Recall that none of the agents had confronted Leal with evidence of his guilt until *after* he had voluntarily confessed. That means the district court conducted the custody analysis presuming that Leal believed he was guilty. And by doing so, the district court allowed Leal's subjective state of mind to color its custody analysis. The district court's assessment "turn[ed] too much on the suspect's subjective state of mind and not enough on the objective circumstances of the interrogation." *Alvarado*, 541 U.S. at 669 (internal quotation marks omitted). As our precedents make clear, that cannot be the case.

Under an objective view of the totality of the circumstances, insulated from irrelevant subjective elements, the agents' interview of Leal did not rise to the level of a custodial interrogation. Start with the interview's location. Leal was stopped on a public street and then agreed to return to the sting house, where another agent escorted him through the backdoor to the interview room. That the house appeared like "a makeshift police station" is not dispositive. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) ("Nor is the requirement of warnings to be imposed simply because the

questioning takes place in the station house … ."). In *Patterson*, we concluded that just because the interrogation occurs inside an FBI conference room "does not by itself establish custody." 826 F.3d at 456. What matters is whether the defendant voluntarily consented to traveling two blocks to the house, which Leal did. *Id.* (noting that the defendant's "voluntariness overc[ame] the fact that he was moved from the driveway to the FBI office"); *see also United States v. Ruiz*, 785 F.3d 1134, 1145 (7th Cir. 2015) (finding that the suspect's consent "mitigated" the "custodial aspect" of a relocation from the driveway to the police station). Here, Leal voluntarily consented to the interview, and the bedroom door remained unlocked throughout the questioning. So Leal did not face the restraint of freedom proscribed in *Miranda* and its progeny.

The same is true for the statements factor. In *Patterson*, this court reasoned that the statements at issue weighed against suppression because the defendant "never said anything that indicated he did not want to speak with the agents" and "was never told he *was* under arrest." 826 F.3d at 458. So too here. Leal neither asked the agents to stop the encounter and interview nor indicated he wanted the investigation to stop. Indeed, he voluntarily consented at every stage: stepping out of the car; complying with a pat down; surrendering his cellphone, wallet, and car keys; accompanying Meadows to the house; and speaking with the two agents inside the interview room. Importantly, during the initial stop, the agents affirmatively told Leal that he was not under arrest. *See Mathiason*, 429 U.S. at 495 (finding "no indication that the questioning took place in a context where [suspect's] freedom to depart was restricted in any way," in part, because "he was immediately informed that he was not under arrest").

Leal fares no better under the remaining *Howes* factors. First, the agents did not use physical restraint, brandish their weapons, or flaunt a threatening presence "such that their requests were likely to be obeyed." *Littledale*, 652 F.3d at 701. They simply stopped Leal and interviewed him with his consent. Second, the short duration of the interview—less than 20 minutes—weighs against a finding of custody. *Compare California v. Beheler*, 463 U.S. 1121, 1121–22 (1983) (considering the brevity of the interview as weighing against a finding of custody), *with United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (noting that the "extended duration of the encounter [] weighs in favor of a finding of custody"). Finally, that the agents arrested Leal at the end of the interview does not change the analysis. An arrest here after questioning does not tip the scale one way or the other as to whether Leal was in custody. *See, e.g.*, *United States v. Jacobs*, 431 F.3d 99, 106–07 (3d Cir. 2005) ("[T]he test for custody is not whether the police in fact let a suspect leave *at the end* of the questioning without hindrance. Rather, it is whether, under the circumstances, a reasonable person *would have believed* that *during* the questioning he or she could leave without hindrance.").

In his defense of the district court's decision, Leal contends he was in custody because he had "no means to go home." Even though Leal had access to his wallet and cellphone, which sat on top of the interview table, the agents still possessed his car keys. Even still, two factors cut against his contention. For one, Leal had voluntarily handed his keys over to the agents so that they could move his car off the public road for safekeeping. And because Leal confessed his guilt so early in the interview, we find it unlikely that the agent could have returned the keys in that short time span, even if Leal had actually asked for them (which he did not). We recognize that

this question could be closer if the agents had questioned Leal at length and the keys remained missing, but that did not happen here.

Considering all of the circumstances of the interview—from the initial encounter in the back alley to the formal arrest at the end of the questioning—we hold that Leal was not in custody within the meaning of *Miranda*.

## III

For the foregoing reasons, we REVERSE the district court's order and REMAND for further proceedings.