In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-3283

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSHUA R. CAMPBELL,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:21-cr-00089-DRL-MGG-1 — **Damon R. Leichty**, *Judge.*

———————————

ARGUED JANUARY 9, 2024 — DECIDED AUGUST 5, 2024

———————————

Before ROVNER, HAMILTON, and JACKSON-AKIWUMI, *Circuit Judges.*

ROVNER, *Circuit Judge.* Joshua Campbell seeks to suppress evidence of child pornography found by his parole officers during an unannounced parole check. He argues that the incriminating statements that led to the evidence cannot be used against him, as both his parole agreement, on the one hand, and the officers' failure to issue *Miranda* warnings on the other, led to violations of his Fifth Amendment rights. The

agreement did not threaten to penalize him for invoking his Fifth Amendment rights, however. Nor was he in custody at the time he revealed the incriminating information. Consequently, Campbell was required to affirmatively assert his rights pursuant to the Fifth Amendment to invoke the benefits of its protection. Because he did not, we must affirm the decision of the district court denying his motion to suppress the evidence.

## I.

In 2011, an Indiana court sentenced Campbell to a 10-year prison term for child molestation. He was released on parole in 2015, after signing a "Conditional Parole Release Agreement." Among other requirements in that agreement, Campbell had to make every effort to remain employed. He was required to allow announced and unannounced home visits which could include searches of his residence and property if there was "reasonable cause to believe [he was] violating or [was] in imminent danger of violating a condition," of his parole agreement, and periodic unannounced examination of his computer equipment. R. 10-1 at 1, 10-2 at 2. The agreement prohibited his possession of "sexual devices or aids," or any computer or electronic device without his parole officer's permission. R. 10-2 at 2. The record is unclear as to whether his first parole officer permitted him to have a cellphone with internet access, but for purposes of this appeal, we adopt the district court's assumption that possession of his cellphone was not, in and of itself, a parole violation.

On April 24, 2019, Campbell's then-current parole officer, Ryan Wheeler, and his former parole officer, Craig Smith, accompanied by two other officers, conducted an unannounced home visit to check on Campbell's employment status. While

the other two officers remained downstairs with Campbell's roommate (also a parolee), Smith and Wheeler went upstairs and found Campbell asleep and naked under a blanket. While he was still in bed, Wheeler asked Campbell if he had anything that would constitute a parole violation. Campbell confessed that he had a collection of sex toys in his nightstand. In response to the officers' inquiry as to whether he had anything else that violated the conditions of his parole, Campbell lifted the covers to reveal a computer. At some point during those early exchanges, the officers patted down Campbell's clothes, handed them to him, and asked him to get dressed. When Campbell unlocked his cellphone at Wheeler's request, Wheeler saw sexually explicit images of people he suspected were minors.

Campbell initially refused to allow the officers to access his locked computer, but he admitted that the computer contained pornography, qualifying that he was not sure of the ages of the subjects of the pornography. Smith informed Campbell that if Campbell did not reveal the password to the computer, Smith would obtain access by way of a warrant, and a few minutes later, Smith left the room to go to his patrol car to do just that. At that point, about 15-20 minutes had elapsed since the officers arrived.

With Smith gone, Wheeler placed Campbell in handcuffs to conduct a search of the room. In response to Wheeler's repeated requests for the computer password, Campbell eventually divulged it, and Wheeler found a folder containing explicit images of minors. Campbell was eventually arrested for possession of child pornography. Indiana law enforcement officers subsequently obtained search warrants for his electronic devices and accessed them without needing a

password. At no point did the parole officers inform Campbell of his *Miranda* rights.

Campbell entered into a conditional guilty plea that preserved his ability to challenge the district court's decision to allow in the evidence obtained from the search of his room. The district court later sentenced him to the mandatory minimum—10 years' imprisonment. In this appeal, Campbell asserts that the State violated his Fifth Amendment rights in two ways: first, by way of a parole agreement that compelled his responses under threat of penalty, and second, when the officers failed to warn him of his Fifth Amendment right to remain silent in the face of their custodial interrogation. We explore each of these arguments in turn, after first setting out the parameters of Campbell's Fifth Amendment rights as a parolee.

## II.

Despite significant restrictions on their liberty, those who are incarcerated, on parole, or on probation do not relinquish all constitutional liberties, and retain, in most instances, their Fifth Amendment protection from being compelled to give incriminating statements. *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). *See U.S. Const. amend. V* ("No person . . . shall be compelled in any criminal case to be a witness against himself."). The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). Our cases speak of the right as being one that is not "self-executing." That is, a person who

wishes to be cloaked with the protections of the Fifth Amendment ordinarily must assert the privilege. *Murphy*, 465 U.S. at 429. And if the questionee opts to answer without asserting rights under the Fifth Amendment, a court will consider those answers to have been freely and voluntarily given. *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Our cases recognize that this assumption must give way, however, in situations in which the subject of an interrogation will feel so compelled to answer that we assume she has lost the "'free choice to admit, to deny, or to refuse to answer.'" *Murphy*, 465 U.S. at 429 (*quoting Garner v. United States*, 424 U.S. 648, 657 (1976)). One of those self-executing situations occurs when the government imposes penalties on the questionee for electing to exercise her Fifth Amendment rights. The second occurs when a suspect is subject to questioning while in police custody.

Campbell claims both circumstances existed at the time he revealed incriminating information to the parole officers. If he is correct, then any statements he made were inadmissible in the subsequent criminal proceedings that the state initiated against him for possession of the child pornography the officers found during the parole check. *Murphy*, 465 U.S. at 426. And the discovered pornography would be excludable as derivative of the unconstitutionally obtained incriminating statements. *Murray v. United States*, 487 U.S. 533, 536–37 (1988). The district court concluded otherwise, however, and denied Campbell's motion to suppress the statements he made to the officers. We review de novo the district court's legal conclusions—such as whether the parole agreement threatened to penalize Campbell for asserting his rights and whether Campbell was in custody—and its factual findings for clear error. *United States v. Cox*, 54 F.4th 502, 511 (7th Cir. 2022).

## A. Threats of a penalty

Campbell never affirmatively asserted his Fifth Amendment right to refuse to answer questions. The right against self-incrimination becomes self-executing, however—that is, it need not be affirmatively asserted—when the government threatens to penalize a questionee for asserting the right. *Murphy*, 465 U.S. at 434; *see also Lefkowitz*, 431 U.S. at 805 ("[A] State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.").

Campbell points to two provisions in the parole agreement that he says underlie the Fifth Amendment violation. First, under the terms of the parole agreement, Campbell "agreed to report to [his] supervising officer as instructed and to **respond to any and all communications** from any authorized employee of the Department of Correction." R. 10-1 (emphasis ours). Second, he acknowledged "that any acts of omissions in violation of the terms of parole [would] subject [him] to being taken into immediate custody … and initiation of proceedings for revocation of [his] parole." R. 10-1.[1] That language, he argues, threatens a penalty—revocation of his parole—for refusing to respond to questions. The Supreme Court, however, has distinguished between threatening a penalty for refusing to respond, and threatening a penalty for invoking Fifth Amendment protections. Requiring a parolee to appear and report to a parole officer and "answer truthfully the questions

---

[1] We assume that the text of the sentence should have said "that any acts **or** omissions" and not "any acts of omissions," but the difference does not affect the outcome in any way.

of a probation officer" does not, in and of itself, give rise to a self-executing privilege. *Murphy*, 465 U.S. at 435, 437. The threat of punishment, such as the revocation of probation, for invoking the Fifth Amendment privilege against self-incrimination, however, does. *Id*. at 435–37. Mere fear of revocation, however, "is not a ground for ruling that a probationer's confession deprived him of his Fifth Amendment privilege." *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003).

At the end of the day, *Murphy* and *Cranley* control the outcome here. In *Murphy*, the defendant's probation officer asked Murphy to meet to discuss his probation. She knew when she made the request that she would be asking him about matters that might incriminate him in a murder investigation. His probation agreement required him to "report to his probation officer as directed, and be truthful with the probation officer in all matters." *Murphy*, 465 U.S. at 422. The agreement also informed Murphy that "[f]ailure to comply with these conditions … could result in his return to the sentencing court for a probation revocation hearing." *Id.* Despite this language, the Court held that there was "no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Murphy*, 465 U.S. at 437. According to the Court's reasoning, "Murphy's probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.* A probation officer, the Supreme Court reasoned, can require a probationer to appear and give truthful testimony about matters relevant to his probationary status,

provided the officer does not make the probationer choose between "making incriminating statements and jeopardizing his conditional liberty by remaining silent." *Id.* at 436.

There is no material difference between Campbell's command to "report to [the] supervising officer as instructed and respond to any and all communications" and Murphy's command to "report to his probation officer as directed, and be truthful with the probation officer 'in all matters.'" *Id.* at 422.[2] In both cases, the "legal compulsion to attend the meeting and to answer truthfully the questions of a probation officer" was distinguishable from a threat to impose a penalty for a valid exercise of the Fifth Amendment. *Id.* at 437. And both Murphy and Campbell retained the "freedom to decline to answer particular questions." *Id.*[3] Assertion of the Fifth Amendment is,

---

[2] Murphy was on probation rather than parole. In the context of the Fourth Amendment, the Supreme Court has noted that parolees have fewer expectations of privacy than probationers, as parole is just a variation on imprisonment while probation is meted out in addition to imprisonment, not in lieu of it. *Samson v. California*, 547 U.S. 843, 850 (2006). It is not clear whether this logic extends to the Fifth Amendment right against self-incrimination, but in any event, Campbell certainly would have no lesser claim to the right to assert the protections of the Fifth Amendment than Murphy had.

[3] Campbell points out that, in his testimony, Smith admitted to "violating" another parolee who refused to answer questions, several years after the events in this case. R. 25 at 75–76. The record does not reveal whether that parolee ultimately was subject to a parole revocation. More importantly, because Campbell could not have known about Smith's actions, and because, under our case law, Campbell was not, himself, threatened with revocation for asserting his Fifth Amendment rights, Smith's report of "violating" another parolee for refusing to answer questions is simply not relevant.

after all, one way to "respond" to the inquiries of a parole officer.

This court, in *Cranley*, following *Murphy*, came to the same conclusion—determining that a defendant had not been threatened with parole revocation for invoking his Fifth Amendment rights even where his probation agreement required both "that he report to his probation officer 'as directed for scheduled or unscheduled meetings,' and that he 'provide true and correct information verbally and in writing, in response to inquiries by the [probation] agent.'" *Cranley*, 350 F.3d at 618. The agreements in *Murphy*, *Cranley*, and in this case allow for the possibility that the defendants could respond by invoking their Fifth Amendment right to refuse to answer. *See id.* at 622.[4]

---

[4] Campbell points to the Ninth Circuit's decision in *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), as an example of a case in which a court found that the probation agreement imposed a penalty for assertion of Fifth Amendment rights when it required a probationer to "promptly and truthfully answer all reasonable inquiries" from the probation officer. The Ninth Circuit determined

> there *is* a significant difference between being required to be "truthful with … probation officer in all matters," *Murphy*, 465 U.S. at 422 (internal quotation marks omitted), and being required to "promptly and truthfully answer all reasonable inquiries." Whereas the former "sa[ys] nothing about [a probationer's] freedom to decline to answer particular questions" and "proscribe[s] only false statements," the latter specifically penalizes a refusal to "answer particular

(continued)

One might question whether it is a realistic assumption that parolees will be aware of their right to claim a Fifth Amendment privilege, having signed a parole or probation agreement with language that, on its face, may appear to require a substantive "response." This court, in *Cranley*, certainly questioned that assumption. *Id.* at 621–23. But despite its skepticism, the *Cranley* panel gave due allegiance to *Murphy*. *Id.* at 622. Likewise, the dissent in *Murphy* explored whether the defendant could have known that he had a constitutional right to refuse to answer his probation officer's questions. *Murphy*, 465 U.S. at 457 (Marshall, J. dissenting). But despite the full airing of doubt in both courts, the assumption prevails. There is no room, therefore, for this panel to find otherwise.

The *Murphy* dissenters noted that "responsible criminal defense attorneys whose clients are given probation will

> questions." *Murphy*, 465 U.S. at 437. In contrast to Murphy, who the Supreme Court found was free to remain silent as long as he was truthful when he spoke, Saechao did not have the luxury of remaining silent without violating the conditions of his probation. Failure to answer a relevant inquiry regarding the conditions of probation would have justified the revocation of his probation.

*Id.* at 1078. We are not bound by the Ninth Circuit's determination of the distinction. But in any event, Campbell was required only to "respond," not to "answer all inquiries." And as *Murphy* and *Cranley* both concluded, invoking the Fifth Amendment is one possible response for a parolee or probationer in these circumstances. *See Murphy*, 465 U.S. at 437; *Cranley*, 350 F. 3d at 622.

inform those clients, in their final interviews, that they may disregard probation conditions insofar as those conditions are inconsistent with probationers' Fifth-Amendment rights." *Id.* at 462 (Marshall, J. dissenting). The better practice would be for the parole agreements themselves to advise parolees of their Fifth Amendment rights explicitly. In contrast to the original underlying parole agreement that is at issue in this case, Campbell's conditions of supervised release pursuant to his judgment in the current matter does just that:

> You must truthfully answer any inquiry by the probation officer … . This condition does not prevent you from invoking the Fifth Amendment privilege against self-incrimination.

R. 49 at 3. If his original parole agreement had provided the same notice, we could have avoided the conflict before us. Of course, he would still have his argument that he was in custody at the time of questioning, but this, as we will see in the subsection below, was a weaker claim.

### B. Custodial interrogation

The Fifth Amendment privilege also becomes self-executing for those in police custody. Given the inherently isolating and compelling nature of a custodial interrogation, "the *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." *Murphy*, 465 U.S. at 430.

It is true that for some purposes, a parolee is in custody. "The essence of parole is release from prison, before the

completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). Campbell's Conditional Parole Release Agreement stated, "I understand that I am legally in the custody of the Department of Correction … ." R. 10-1. But "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). For example, the definition of "custody" for *Miranda* purposes is narrower than it is for habeas corpus purposes. *Murphy*, 465 U.S. at 430. Even "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Howes*, 565 U.S. at 511. We have previously compiled a long list of cases holding that probationers or parolees were not in police custody for *Miranda* purposes. *Cranley*, 350 F.3d at 620 (collecting cases). To that earlier list we can add many more. *See State v. Brandon*, 287 A.3d 71, 95–96 (Conn. 2022), *cert. denied*, 143 S. Ct. 2669 (2023) (collecting cases). In short, the fact of parole or probation alone does not indicate whether a particular person is in custody for *Miranda* purposes. Rather, a court must make an individualized determination about custody as it would in any other circumstance.

We employ an objective test to determine whether a person is in custody, looking at the circumstances surrounding the interrogation and asking whether "'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Howes*, 565 U.S. 509 (*quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). To make that assessment, a court must look at the totality of the surrounding circumstances including factors such as "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical

restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (internal citations omitted); *see also Cox*, 54 F.4th at 511. We have recited lists of examples of other factors we might consider, but always with the caveat that the driving determination is the totality of the circumstances. For example, in *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) we noted that "[w]e have provided a non-exhaustive list of example factors, which includes: 'whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.'" *Id.* (*quoting United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011)). In the end, we look to see whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

Campbell's claim that he was in custody emphasizes the fact that the officers were very large men, and that their mere presence in a small room (one stood inside the room, and the other in the doorway) would have blocked Campbell's egress. Moreover, they wore "battle dress uniform"—tactical pants, a t-shirt or polo, a utility belt with a firearm, taser, mace, ammunition, and handcuffs, and entered unannounced, while Campbell was in a vulnerable position—naked and sleeping. According to Campbell, the armed, commanding officers were firmly in control of the environment.

But questioning by a parole officer presents a somewhat unique set of circumstances. For the average citizen, "'[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" *Patterson*, 826 F.3d at 459 (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

> In the paradigmatic *Miranda* situation—a person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is "cut off from his normal life and companions," *Maryland v. Shatzer*, 559 U.S. 98, 106 (2010), and abruptly transported from the street into a "police-dominated atmosphere," *Miranda*, 384 U.S. at 456, may feel coerced into answering questions.

*Howes*, 565 U.S. at 511. But meetings with parole officers are inherently different. Parolees sign agreements giving fair warning that they will be subject to both scheduled and unscheduled visits. They likewise understand that their parole officers will ask questions about parole compliance, including whether the parolee has engaged in criminal conduct. *See Murphy*, 465 U.S. at 432 ("[T]he nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality."). "Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the

environment." *Murphy*, *id.* at 433. Of course, a parole inter-view might become custodial for *Miranda* purposes (*e.g. United States v. Byram*, 145 F.3d 405, 409 (1st Cir. 1998)), but the factors that cause a court to presume compulsion in a cus-todial arrest do not necessarily exist during regular parole vis-its. Once again, the determination depends on the totality of the circumstances.

In this case, Campbell encountered a regular, unan-nounced parole check with officers with whom Campbell was very familiar. Smith supervised Campbell from his 2015 re-lease until early 2019 (excluding some period during which Campbell was in prison for an earlier parole violation). Campbell saw Smith every Friday at group meetings, and Smith had visited his home ten times before. Wheeler had only supervised Campbell for about four months, but they too met at weekly group meetings and Wheeler had visited Campbell at home three to five times previously. A parolee's "regular meetings with his probation officer should have served to familiarize him with her and her office and to insu-late him from psychological intimidation that might overbear his desire to claim the privilege." *Murphy*, 465 U.S. at 433. Those officers were wearing what Campbell was accustomed to seeing them wearing. Campbell was not handcuffed or physically restrained. *See id.* at 432. He was in the familiar en-vironment of his home. *See Howes*, 565 U.S. at 511. The officers did not display firearms or threaten to use force, and no one told Campbell that he was under arrest or that he was not free to leave. *See United States v. Leal*, 1 F.4th 545, 552 (7th Cir. 2021). The officers were courteous. *See United States v. Am-brose*, 668 F.3d 943, 958 (7th Cir. 2012). And although there were actually four officers at the house, two remained down-stairs and there is no evidence that Campbell was aware of

their presence. Campbell had consented to these visits by signing his parole agreement, which significantly reduced any expectation of privacy. *See United States v. Beechler*, 68 F.4th 358, 365 (7th Cir. 2023) ("When assessing the privacy expectations of a person subject to a correctional system, salient factors include … whether the individual has agreed to waive some or all Fourth Amendment rights in exchange for more freedom within the correctional system."). It was also common and expected that officers would question him about parole violations. *See Murphy*, 465 U.S. at 432 . Nothing about the initial part of this visit was any different than any of the dozen or more parole visits which Campbell had experienced before. Campbell made the incriminating statements about the sex toys, computer, and pornography after only 15-20 minutes of questioning, and before Wheeler handcuffed him.

*Murphy* and *Cranley* also control our analysis of the custodial nature of the interrogation. The Supreme Court held that Murphy was not in custody requiring *Miranda* warnings despite the fact that the probation officer compelled Murphy's attendance and truthful answers, she sought incriminating evidence, Murphy was not expecting the types of questions the officer asked, and there were no observers to guard against abuse or trickery. *Id.* at 431–32. The court concluded that Murphy was in a familiar environment—the probation office—with familiar officers, he was not physically restrained, and could have left at any time. *Id.* at 432.

Similarly, this court in *Cranley*, relying on *Murphy*, came to the same conclusion, although "[w]ith reluctance, given the coercive atmosphere and the pressure on Cranley to talk in order to avoid jeopardizing his probation." *Cranley*, 350 F.3d at 619. This court concluded that Cranley met with the

probation officer in a building otherwise unrelated to law enforcement, there were no usual indicia of police custody, and Cranley could have asked officers if he was free to leave. *Id.* at 620.

In any event, almost immediately after the officers' arrival, Campbell confessed to having sex toys in his nightstand—a violation of parole which would have given the officers reasonable cause to look further for other violations, which, in turn, would have led to the discovery of the child pornography. After discovering the illegal photos on his phone, and the computer under the blanket, the officers eventually handcuffed Campbell. But even if Campbell was in custody when he gave officers further information, he was not in custody when he made his first admissions which would have inevitably and lawfully led to the rest.

*Murphy* and *Cranley* dictate that Campbell's parole agreement did not threaten a penalty for exercise of his Fifth Amendment protections, and he was not in custody when he made the relevant incriminating statements. Because Campbell did not invoke his Fifth Amendment right, and it was not otherwise self-executing, the district court properly denied his motion to suppress the evidence, and its opinion is therefore AFFIRMED.