In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1744

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRADLEY M. COX,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 18-cr-00083 — **Holly A. Brady**, *Judge.*

ARGUED OCTOBER 25, 2022 — DECIDED NOVEMBER 23, 2022

Before SYKES, *Chief Judge*, and FLAUM and LEE, *Circuit Judges*.

FLAUM, *Circuit Judge*. A jury convicted Bradley Cox of sextorting and exploiting multiple victims, including minors, and receiving child pornography. Cox now raises several issues for our consideration. On the constitutional front, Cox claims Fourth Amendment violations based on the FBI agents' warrantless search, Fifth Amendment violations based on the agents' failure to give *Miranda* warnings during

two interrogations, and Sixth Amendment violations based on the district court's evidentiary and procedural decisions. In addition, Cox argues that the government did not introduce sufficient evidence to support his convictions. We affirm on all counts.

## I. Background

In 2018, the FBI was alerted to a predatory scheme involving various Facebook accounts and (apparently) many victims. This case concerns four particular victims, two of them minors. For three of the victims, the pattern was similar. The perpetrator reached out using a Facebook account under a false name and directed the victims to contact the same, unfamiliar phone number. He informed the victims that he had nude photos of them, taken from the stash of a Facebook account he had previously "hacked." He said he would leak the photos if the victims did not meet his demands—chiefly, sending more explicit material. When they did not comply, he followed through on his threat. The fourth victim was a minor. After making contact through Facebook, the perpetrator took a slightly different tact; he never gave the victim the phone number to contact and did not have photos from the other account to use as blackmail. All the same, he manipulated and bullied her until she sent him explicit material. The perpetrator did not tell any of the victims his real name.

Special Agent Jason Stewart led the FBI's investigation. Eventually, the FBI tracked the internet address associated with some of the offending messages to a family business called Burns Construction Company, where Bradley Cox worked. Stewart and his colleague, Special Agent Joseph Gass, made their way over to Burns Construction without a

search warrant. Upon arriving, they spoke with Michael Burns, a part-owner of the company. The agents asked if they could search and image the computer in Cox's office, and Burns agreed. (Cox had already left for the day.) The computer's browsing history contained traces of a specific "Virtual Private Network" (VPN). Generally speaking, VPNs can facilitate discreet internet browsing by disguising the user's identity. The same VPN found on Cox's work computer had been used to cover up the perpetrator's tracks in this case.

Right after leaving Burns Construction, Stewart and Gass made their way to Cox's home. Cox agreed to speak with them outside. It was evening. The agents assured Cox that he could end the conversation at any time and that he would not be arrested that night. When Cox proposed helping the FBI investigate the broader sextortion network in exchange for leniency, the agents responded that such an arrangement was out of their control. Cox still decided to talk. He made numerous incriminating statements. Among other things, Cox admitted to accessing certain of the offending Facebook accounts, owning the phone number that three of the victims had contacted, using the VPN found on the work computer, and messaging some of the victims. Also, Cox agreed to let the agents take his personal laptop, which Gass retrieved from the house. The agents left after a couple hours.

The next day, Stewart and a local police detective went back to Burns Construction to return the now-imaged work computer. While there, they spoke with Cox, who made more incriminating statements. Cox admitted to other communications with the victims and showed them his online storage system, which contained many explicit images.

A couple weeks later, Cox was arrested. A grand jury charged him with three counts of extorting people with threats to share their sexually explicit images (18 U.S.C. § 875), two counts of coercing (or attempting to coerce) minors to engage in sexually explicit conduct, resulting in a visual depiction, (*Id.* § 2251), and one count of receiving child pornography (*Id.* § 2252A). During pretrial proceedings, Cox decided to represent himself *pro se*. His appointed counsel stayed on in a standby role.

The government's trial strategy centered on Cox's confessions and a slew of forensic, technical evidence. For instance, the government aligned his internet usage at home, during his commute, and at work with the activity of the phone number that had sent many of the extortionist messages. Shianna Waller's testimony also played an important role. Waller had been in contact with one of the offending Facebook accounts and was soon recruited to help collect explicit images. She testified that she had arranged to meet the user of the account in person and, when a car arrived to pick her up, Cox was behind the wheel.

For his part, Cox's primary defense was shifting the blame to others. In his own words to the jury, "If someone else did it, then Bradley Cox didn't." As Cox would tell it, although that "someone" could have been multiple people, the most important suspect of all was David Kilcline. Kilcline had potential ties to the broader sextortion scheme. Waller testified about Kilcline's affiliation with one of the offending accounts, and Stewart had even interviewed him at one point. Yet Kilcline himself did not testify.

Faced with this evidence, the jury convicted Cox on all charges. Cox filed a couple post-trial motions, which the district court denied. He then appealed.

## II. Discussion

Cox brings myriad arguments predicated on alleged violations of the Fourth, Fifth, and Sixth Amendments, as well as an argument that there was insufficient evidence to support the jury's verdict. We address each issue below.

### A. Fourth Amendment

First, Cox contends that Stewart and Gass violated his Fourth Amendment rights by searching his work computer (and his office, where the computer was located) without a warrant and that the district court should have suppressed any evidence obtained as a result. The government responds that Cox waived this argument.

Motions to suppress must be made before trial "if the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3)(C). When a party fails to meet this deadline, courts may still consider the issue upon a showing of good cause for the party's tardiness. *Id.* R. 12(c)(3). When the party further fails to present good cause to the district court, "we examine whether, *if* a motion for relief had been made *and* denied, the district court *would have* abused its discretion in concluding that the defense lacked good cause." *United States v. Vizcarra-Millan*, 15 F.4th 473, 500 (7th Cir. 2021) (quoting *United States v. Adame*, 827 F.3d 637, 647 (7th Cir. 2016)), *cert. denied sub nom. Grundy v. United States*, 142 S. Ct. 838 (2022). This review is "hyper-deferential." *Id.*

Cox did not timely present his motion to suppress evidence related to the warrantless search. Rather, in the middle of cross-examining Burns at trial—to be precise, right after Burns said he consented to the agents' search—Cox asked for a sidebar. At that point, Cox orally moved to suppress "any evidence obtained from the work computer." The court denied his motion as untimely. Cox asked for and received another sidebar, but the court rebuffed him again.

Cox never provided good cause to the district court for his untimeliness. He points out on appeal that the court did not give him much of an opportunity to present good cause, and this is true—to an extent. Although the court did quickly deny Cox's motion as untimely without mentioning a good-cause exception, Cox consulted with his standby counsel before the second sidebar. In these circumstances, it is not unreasonable to burden Cox with raising good cause himself.

We therefore review Cox's hypothetical good-cause proffer under the abuse-of-discretion standard. *See Vizcarra-Millan*, 15 F.4th at 500. On appeal, Cox provides two explanations for his failure to timely file the suppression motion. Mainly, he says that, as a *pro se* litigant, he should be held to a lower bar than we would otherwise impose. We do tend to apply more liberal standards to litigants proceeding *pro se*, including (maybe especially) in the procedural context. *See, e.g., Blitch v. United States*, 39 F.4th 827, 833 & n.2 (7th Cir. 2022) (concluding that the defendant's *pro se* status "tip[ped] the scales" in his favor for a close procedural call). That said, "pro se litigants are generally subject to the same waiver rules as those who are represented by counsel." *Johnson v. Prentice*, 29 F.4th 895, 903 (7th Cir. 2022).

In *United States v. Young*, 955 F.3d 608 (7th Cir. 2020), this Court rejected an argument like the one Cox makes now. The defendant in that case contended that the district court should suppress evidence from a search, but only did so "during the trial after the prosecution introduced the evidence." *Id.* at 615. We disagreed that the defendant's *pro se* status justified his untimely motion, citing his discussions with his attorney before going *pro se* and the "several other pretrial motions" he filed afterwards. *Id.* As such, we held that the district court had not abused its discretion by denying the motion. *Id.*

Here, Cox filed his first motion to suppress before he decided to proceed *pro se*. His previous attorney remained on as standby counsel even after Cox went *pro se*. What is more, Cox then filed more motions to suppress before the trial. His demonstrated ability to comply with the pretrial deadline undermines his argument that he should now be afforded greater latitude.

Cox offers *Bates v. Jean*, 745 F.2d 1146 (7th Cir. 1984), as a model for this Court to follow, but to no avail. There, the defendants argued for waiver based on the judge asking the *pro se* plaintiff a vague question about a confusing procedural rule and the plaintiff answering that he had no objections. *Id.* at 1150. Noting the fact-specific limitations of our holding, we concluded that the plaintiff "in all probability did not understand the judge's question" and declined to apply waiver. *Id.*

In contrast, Cox does not appear to have been confused by the relatively straightforward application of Rule 12(b)(3)(C). Again, he complied with its mandate by timely filing his other suppression motions. The district court thus would not have abused its discretion had it declined to find good cause based on Cox's *pro se* status.

Briefly, Cox raises another potential justification for his untimely motion. In a single sentence, he says that he was "not at least initially aware [that] Michael Burns was the individual who permitted [the agents] to search Cox's computer." Cox does not explain when, exactly, he learned about Burns's involvement and offers no reason for not discovering it sooner. In light of the paltry presentment of the issue on appeal and our hyper-deferential review, the district court would not have abused its discretion had it denied Cox's motion on this ground either.

As such, Cox has not presented good cause for failing to comply with the Rule 12(b)(3)(C) deadline. We need not reach the merits of his Fourth Amendment arguments.

## B. Fifth Amendment

Next, Cox argues that he did not receive the necessary *Miranda* warnings during two interviews with authorities: first, at night outside his home, and second, the following day at his office. *Miranda* warnings are required when a suspect is interrogated while in custody. *United States v. Leal*, 1 F.4th 545, 549 (7th Cir. 2021). In this case, the parties agree that Cox never received a *Miranda* warning. They also agree that each interview constituted an interrogation. So, the only issue we must decide is whether Cox was "in custody."

"We review the district court's determination that [Cox] was not in custody *de novo* and the district court's factual findings for clear error." *United States v. Patterson*, 826 F.3d 450, 454–55 (7th Cir. 2016). Whether a person is "in custody" is an objective test. *Leal*, 1 F.4th at 549. We ask "whether 'a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* (alteration in original) (quoting *Howes v. Fields*, 565 U.S. 499, 509 (2012)). This

inquiry draws from the surrounding circumstances, including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Lentz v. Kennedy*, 967 F.3d 675, 689 (7th Cir. 2020) (quoting *Howes*, 565 U.S. at 509); *see also Patterson*, 826 F.3d at 455 ("We have provided a non-exhaustive list of example factors, which includes: 'whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.'" (quoting *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011))).

We must analyze the totality of the circumstances, not just one particular factor. *Patterson*, 826 F.3d at 455. In the end, there is no custody unless "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Lentz*, 967 F.3d at 689 (quoting *Howes*, 565 U.S. at 509).

### 1. The Interrogation at Cox's Home

Cox argues that he was in custody during the interrogation outside his home. He points to numerous factors, such as Stewart and Gass showing up in the evening unannounced; the interrogation taking place outside, separated from his family; the interrogation lasting a couple hours; Stewart and Gass not explicitly discounting the possibility of Cox cooper-

ating with the FBI in exchange for leniency; and Gass's statement during the suppression hearing that he would have accompanied Cox into the house had Cox tried to retrieve his personal computer himself.

This Court's *Patterson* decision illustrates just how much is required to show custody. In that case, two agents wearing street clothes approached a suspect in a driveway and asked if he would go with them to the local FBI office to "clear his name." *Patterson*, 826 F.3d at 452. The suspect agreed. *Id.* The agents performed a brief pat-down, then they all piled in a single car to make the drive over. *Id.* at 453. Upon arriving at the office, the group made their way through two secure doors before settling in a conference room. *Id.* No force, handcuffs, or threats were used. *Id.* at 458. Over the next two hours, the suspect divulged incriminating information. *Id.* at 453–54. The agents assured the suspect he would not be arrested that day, and true to their word, they gave him a ride to a destination of his choosing after the interview. *Id.* We concluded that a reasonable person would not have felt "in custody" under these circumstances. *Id.* at 459.

With *Patterson* in mind, we turn to the interrogation at issue. The agents spoke with Cox on the sidewalk and porch outside his home—places where, presumably, Cox would have felt comfortable. *See United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (explaining that, when an interrogation takes place "in familiar surroundings," that factor "generally weighs in favor" of determining there was no custody). In addition, the interrogation occurred in public. *See United States v. Ambrose*, 668 F.3d 943, 957 (7th Cir. 2012) ("Where an encounter with law enforcement occurs in a public place, the Court has recognized that the public nature of the interaction

and the ease of leaving limit the coercive impact." (citing *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984))). Even if people were not milling around Cox's yard during the interrogation, it remained open to the surrounding neighborhood. *Cf. Patterson*, 826 F.3d at 455 (noting that "a driveway on a public street" was "a public setting").

Cox counters that the location of the interrogation separated him from his family. We considered this factor in *Borostowski*, but there, the suspect had been "forcefully separated from family members," handcuffed, and escorted around the house with "agents at his side." 775 F.3d at 862–63. The interrogation here pales in comparison. Cox freely consented to speaking with the agents outside, and he was never handcuffed or threatened with handcuffs. *Cf. Leal*, 1 F.4th at 551–52 (determining the suspect was not in custody when he "voluntarily consented at every stage" and the officers "did not use physical restraint").

Other circumstances also compel the conclusion that Cox was not in custody. The agents wore street clothes and kept their weapons at bay. *Cf. Patterson*, 826 F.3d at 452, 457 (noting that both agents "were wearing casual street clothes" and that neither "dr[ew] or actively use[d] their weapons to assert authority"). Stewart and Gass were the only agents there. *Cf. id.* at 458 ("There were only two agents."). The interrogation appears to have been non-confrontational. *Cf. Leal*, 1 F.4th at 552 (observing that the agents did not "flaunt a threatening presence 'such that their requests were likely to be obeyed'" (quoting *Littledale*, 652 F.3d at 701)). The agents asked Cox if he wanted to talk (he did) and said that he could end the interrogation at any time (he did not). *Cf. id.* at 551 ("Leal neither

asked the agents to stop the encounter and interview nor indicated he wanted the investigation to stop."). Indeed, the agents gave Cox no reason to think he was facing imminent arrest; they truthfully told him that he would be free to go at the end of the interrogation. *Cf. Ambrose*, 668 F.3d at 958 (emphasizing the interviewer's "statement that [the suspect] was not under arrest and his reference only to the possibility of future charges"). A reasonable person facing these circumstances would not consider himself in custody.

Cox's remaining arguments cannot overcome these factors. The length of the interrogation, which arguably does favor custody here, is just one consideration. *See Howes*, 565 U.S. at 515 (characterizing an interview's duration of "between five and seven hours in the evening" as lending only "*some* support" to a determination of custody (emphasis added)). Nor can Cox hang his hat on the agents' failure to outright discount his proposal of cooperating with the FBI; a reasonable person would not take that omission to mean they were in custody. *See Ambrose*, 668 F.3d at 959 (explaining that courts must consider "a reasonable person's perception"). Further, we take no import from Gass's testimony that he would have gone with Cox into his home had Cox tried to retrieve his computer himself. Gass never said this to Cox, who never attempted to go inside. *See id.* at 954 ("Neither the subjective views of the suspect being questioned nor that of the officer engaging in the questioning is considered.").

Finally, Cox suggests that the agents should have realized he was in custody once he began answering their questions with incriminating information. Not so. *Miranda* is not required whenever agents hold a productive interrogation. *See*

*Leal*, 1 F.4th at 550 ("[A] suspect's guilty conscience does not turn every police encounter into a custodial interrogation.").

The factors attending the interrogation outside Cox's home therefore indicate that Cox was not in custody. The district court was correct to deny the motion to suppress Cox's statements.

### 2. The Interrogation in Cox's Office

The second interrogation occurred the next day in Cox's office at Burns Construction. At the outset, we must determine whether we should analyze this interrogation in the first place. The government insists we should not because Cox failed to object to the office interview before the district court when he contested the magistrate judge's report and recommendation. The district court agreed that Cox had only objected to the home interrogation. Even Cox's counsel concedes this point, arguing that we should review the office interview regardless given Cox's *pro se* status.

Our "general rule" is that a party waives the right to appeal an issue "first decided by a magistrate judge" if he "fails to file an objection with the district court." *United States v. Charles*, 476 F.3d 492, 495–96 (7th Cir. 2007) (quoting *United States v. Hernandez-Rivas*, 348 F.3d 595, 598 (7th Cir. 2003)). The limited exception when waiver would "defeat the ends of justice," *Hernandez-Rivas*, 348 F.3d at 598, is not available here; as mentioned above, waiver rules apply to represented and *pro se* litigants alike, *Johnson*, 29 F.4th at 903. Thus, Cox's failure to object to the magistrate judge's finding about the office interview constitutes a waiver.

In short, Cox was not in custody during the interrogation outside his home and waived his argument as to the office interview. We affirm the district court's disposition of the Fifth Amendment issues.

## C. Sixth Amendment

Cox raises two Sixth Amendment arguments, both related to his chief defense that Kilcline, not he, committed the charged offenses. First, Cox takes issue with the district court prohibiting two witnesses from testifying as to Kilcline's previous bad acts. Second, Cox contests the district court's refusal to compel the attendance of Kilcline himself. According to Cox, these decisions prevented him from presenting a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))); *see also Taylor v. Illinois*, 484 U.S. 400, 409 (1988) ("The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words ….").

### 1. *Wolfe and Hazelwood's Testimony*

At trial, Cox sought to call Hailey Wolfe and Marc Hazelwood to testify about their previous experiences with Kilcline—to establish Kilcline's "modus operandi," as Cox frames it on appeal. The district court denied these proffers

on the ground that the testimonies would be irrelevant and would confuse the issues.

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Bonin*, 932 F.3d 523, 543 (7th Cir. 2019). We will reverse only if "no reasonable person could agree with the district court." *United States v. Harden*, 893 F.3d 434, 450 (7th Cir. 2018) (quoting *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002)). Whether a ruling infringed the defendant's constitutional right to present a defense is a separate question; we review that issue de novo. *Bonin*, 932 F.3d at 543.

Cox contends that Wolfe and Hazelwood's testimonies were both admissible under Federal Rule of Evidence 404(b). Rule 404(b) bars evidence of prior bad acts to show a person "had a propensity to commit a crime" but permits it for other purposes. *United States v. Edwards*, 26 F.4th 449, 454 (7th Cir. 2022). Although the rule normally serves as a shield for the defense, its role can flip, like when a defendant tries to introduce evidence of someone else's "prior bad acts if that evidence tends to negate the defendant's guilt." *United States v. Sanders*, 708 F.3d 976, 992 (7th Cir. 2013). Cox's attempt to show Kilcline's modus operandi qualifies as this so-called "reverse" 404(b) evidence. *See United States v. Murray*, 474 F.3d 938, 939 (7th Cir. 2007) (describing a defendant's attempt to use "'other crimes' of *another* person to try to shift the blame to that person").

In such a scenario, we are less concerned with improper character implications because "the jury is not being asked to judge" the subject of the evidence. *Id.* Still, the defendant must clear the hurdles posed by other rules of evidence. *United States v. Alayeto*, 628 F.3d 917, 921 (7th Cir. 2010). For example,

Rule 401 bars irrelevant evidence. Fed. R. Evid. 401. And as often arises in the reverse 404(b) context, *Murray*, 474 F.3d at 939, Rule 403 bars evidence when the risks of its admission "substantially outweigh[]" its probative value, Fed. R. Evid. 403. "[U]nless the other crime and the present crime are sufficiently alike to make it likely that the same person committed both crimes, so that if the defendant did not commit the other crime he probably did not commit this one, the evidence will flunk Rule 403's test." *Murray*, 474 F.3d at 939.

Here, Kilcline's proffered prior bad acts share only generic similarities with the at-issue conduct. Wolfe would have recounted how she previously sent Kilcline (her boyfriend at the time) nude photos of herself, which he distributed online after she refused his demands for more material. Hazelwood would have described Kilcline's predatory practices growing up and how Kilcline had recently "hacked" the Facebook account of Hazelwood's ex-girlfriend and used it for blackmail. Neither Wolfe nor Hazelwood proffered that Kilcline relied on the same phone and VPN tactics that the perpetrator of these crimes used. In fact, anonymity seems to have been the least of Kilcline's worries; Wolfe sent her photos directly to his personal Facebook account, and he told Hazelwood's ex-girlfriend his full name.

Even assuming Wolfe and Hazelwood's proffered testimonies can meet the low bar for relevance, they are barely probative. Reverse 404(b) evidence requires "something distinctive about all the crimes that makes them form a pattern, rather than their having merely a chance resemblance." *Murray*, 474 F.3d at 941. That Kilcline may have sought explicit photos from other women and "hacked" other Facebook accounts is not enough to show that he committed the offenses

at issue. What is more, admitting this testimony likely would have added even more confusion to an already-complex fact pattern. *See Alayeto*, 628 F.3d at 922 (explaining that Rule 403 helps to exclude evidence that might "distract[]" jurors from "the central issue in the case," especially when that evidence has "minimal relevance"); *Murray*, 474 F.3d at 941 ("Without insistence on more than mere 'similarity,' criminal trials may get out of hand, as defendants cast for other criminals—fishing in a vast sea—on whom to pin their crime.").

Essentially, Cox proffered Wolfe and Hazelwood's testimonies as a means of "pointing a finger at someone else who … *might* have committed" the charged offenses. *Murray*, 474 F.3d at 939. The district court did not abuse its discretion by preventing this tactic.

Moving to the constitutional question, the Supreme Court has expressly approved limitations on a defendant's ability to introduce evidence "show[ing] that someone else committed the crime with which they are charged." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006). Also, Cox could still present his defense without these two particular witnesses. The district court allowed a different witness to testify about her experience with an online predator going by "David" (Kilcline's first name), and Stewart and Waller spoke to potential ties between Kilcline and these offenses. *See Bonin*, 932 F.3d at 543–44 (determining there was no violation when the defendant "presented a defense" on all contested issues). This was sufficient to satisfy Cox's rights.

### 2. *Kilcline's Attendance*

In the same vein, Cox argues that the district court erred by refusing to compel Kilcline's attendance at trial. Cox had

previously tried to serve Kilcline three times. Each attempt was technically improper due to the lack of witness and mileage fees. *See* Fed. R. Crim. P. 17(d). On the third day of trial, Cox orally requested the district court's help.

The district court reasoned that Cox was effectively asking for a new, court-ordered subpoena under Federal Rule of Criminal Procedure 17(b). Rule 17(b) requires district courts to issue a witness subpoena on behalf of the defendant "if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense." Fed. R. Crim. P. 17(b). We will not reverse unless the district court's denial of the motion was an abuse of its "wide discretion" over such matters. *See United States v. Chapman*, 954 F.2d 1352, 1362 (7th Cir. 1992) (quoting *United States v. Garza*, 664 F.2d 135, 141 (7th Cir. 1981)).

Although the district court gave a couple reasons for denying Cox's request, we need only address one of them: timeliness. Cox made his request three days into trial. This is especially notable as the court had already deemed his previous Rule 17(b) motion (concerning other witnesses) untimely when it was brought five days *before* trial. Other circuits have approved the consideration of timeliness when deciding Rule 17(b) motions. *See, e.g.*, *United States v. Muho*, 978 F.3d 1212, 1219 (11th Cir. 2020), *cert. denied,* 141 S. Ct. 2613 (2021); *United States v. Orr*, 692 F.3d 1079, 1095 (10th Cir. 2012). We now chart the same course. Cox's motion in the midst of trial was untimely, and he does not offer a good reason for not bringing

it earlier.[1] The district court acted within its wide discretion by denying the motion.

Thus, none of the district court's decisions violated Cox's Sixth Amendment rights. The substantial evidence supporting the jury's verdict, described next, provides further support. *See United States v. Hart*, 995 F.3d 584, 590 (7th Cir. 2021) (explaining that "[a] defendant's right to compulsory process" is not abridged unless the omitted testimony would have been "material," meaning there is a "'reasonable likelihood' … that it 'could have affected the judgment of the trier of fact'" (citations omitted)).

### D. Sufficiency of the Evidence

Cox's final argument is that the government did not present sufficient evidence to convict him. Recall that Cox was convicted of three types of crimes: (1) extorting people with threats to share their sexually explicit images, (2) coercing (or attempting to coerce) minors to engage in sexually explicit conduct, resulting in a visual depiction, and (3) receiving child pornography.[2]

Overturning a jury verdict for insufficient evidence is a "steep, uphill battle." *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008). The evidence, as viewed in the "light most favorable to the government," must be so lacking that no "rational trier of fact" could have decided to convict. *United*

---

[1] Cox notes that he was actively trying to serve Kilcline (as opposed to sitting on his hands), but that does not adequately explain why he waited so long to bring this issue to the district court's attention.

[2] It is unclear whether Cox is challenging the extortionist convictions. At any rate, the evidence supported all the convictions, including those ones, for the reasons discussed here.

*States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (quoting *United States v. Webster*, 775 F.3d 897, 904–05 (7th Cir. 2015)). This burden is "nearly insurmountable." *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 405 (7th Cir. 2020) (quoting *Faulkner*, 885 F.3d at 492); *see also Vizcarra-Millan*, 15 F.4th at 506 ("[T]he height of the hurdle the defendant must overcome depends directly on the strength of the government's evidence."). If the defendant forfeited his claim by failing to properly move for acquittal before the district court, his odds grow fainter still. *See United States v. Lundberg*, 990 F.3d 1087, 1095 (7th Cir. 2021) (explaining that we review such challenges for plain error).

After concluding that Cox's motion for acquittal was untimely, the district court explained that it would have sustained the jury's verdict on the merits anyway. We may similarly treat the issue as preserved, regardless of whether Cox properly brought his motion below, because he cannot succeed under the more forgiving standard. *Cf. Farris*, 532 F.3d at 619 (holding that application of the "heightened standard of review" would have "no impact on the merits" given the ample evidence supporting the jury's verdict).

Cox deploys a two-pronged attack, offering on the one hand evidence he says exonerates him and, on the other, evidence he says shifts the blame to third parties.[3]

As for the first strategy, Cox mostly relies on various bits of technical evidence, like logs of his internet history that do

---

[3] Cox also makes a conclusory, single-sentence argument about the evidence supporting a nexus to interstate commerce. This undeveloped argument does not suffice on appeal. *See Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 464 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 401 (2021).

not link his personal devices to certain offending Facebook accounts. The jury considered this evidence but decided to instead credit the other, plentiful ties to Cox, including that the phone number used to commit the offenses was registered through Burns Construction's internet connection; that the activity for this phone number aligned with Cox's home, commute, and work habits; that Cox met Waller in person after making arrangements through one of the offending accounts; and that Cox confessed to the FBI multiple times. In response to that last point, Cox contends that Stewart's recollection of their conversations should not be trusted. But it is "well settled" that this Court does not weigh in on credibility issues when reviewing a verdict. *Farris*, 532 F.3d at 619. The jury reasonably favored all this condemnatory evidence over the evidence Cox presented.

Cox focuses most of his attention on the evidence suggesting that another person (or persons) could have committed the charged offenses. For one thing, as already mentioned, Kilcline may have some ties to the relevant Facebook accounts. Waller also admitted that she had logged into the accounts to collect explicit photos. In fact, the district court agreed there was "little question" multiple people used one account in particular. And Cox points to other events suggesting that the sextortion scheme remained active after his arrest.

Nonetheless, "[w]e cannot re-weigh the evidence" at this stage. *Faulkner*, 885 F.3d at 492. Given all the evidence listed above, indications that other people may have committed similar crimes and theoretically could be to blame for the at-issue offenses do not render the jury's decision irrational. *Cf. United States v. Rogers*, 387 F.3d 925, 936 (7th Cir. 2004) (hold-

ing there was sufficient evidence to support the conviction despite the defendant's argument that the "evidence did not rule out the possibility that another person used his cellular telephone [in furtherance of the crime] that day"). The evidence against Cox was substantial, and he does not undermine it on appeal.

### III. Conclusion

For these reasons, we AFFIRM the judgment of the district court.