In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 22-3269

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSEPH ALBERT FUCHS III,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:21-cr-30054-SPM-1 — **Stephen P. McGlynn**, *Judge.*

———————————

ARGUED DECEMBER 4, 2023 — DECIDED OCTOBER 8, 2024

———————————

Before ROVNER, SCUDDER, and PRYOR, *Circuit Judges.*

ROVNER, *Circuit Judge.* Defendant-appellant Joseph Fuchs challenges his convictions arising out of a February 2018 trip to the Philippines that he took in order to have sex with a 14 year-old girl. We affirm.

**I.**

Fuchs was a special agent employed by the U.S. Postal Service's Office of the Inspector General. In March of 2019, Homeland Security Investigations ("HSI"), a law enforcement agency within the Department of Homeland Security, was contacted by the Illinois Attorney General's office, which had received a tip originating from the social media and networking service Facebook that Fuchs was sending private Facebook messages to a suspected minor in the Philippines—whom the parties refer to as MV-1—recounting sex acts in which the two of them had engaged during Fuchs's trip to the Philippines the previous year.

Follow-up investigation by HSI confirmed that Fuchs had visited the Philippines from February 14 through 23, 2018, and that he maintained two Facebook accounts. Examination of his Facebook messaging revealed extensive correspondence with MV-1 from November 2017 through January 2019. The exchanged messages reflected, among other things, Fuchs's belief that MV-1 was 14 or 15 years old at the time of relevant events (in his initial messages, he told her that they would have to wait until she was 18 to have sex)[1] and explicit

---

[1] Fuchs had met MV-1 during a prior trip to the Philippines. When he began corresponding with MV-1 on Facebook in November 2017, he told MV-1 that he surmised (correctly) that she was 14 years old. But when he was interviewed by HSI agents in 2019, Fuchs said that he did not recall how old she was when they began their relationship. Fuchs allowed that MV-1 might have been 15 in February 2018, "but then again, this kid doesn't have an i.d. … . I don't honestly know how old this kid is, I can only go by what she's told me." Gov. Trial Ex. 37 at 1:00:41 to 1:01:10. Whether she was 14 or 15 years old has no legal relevance. There is no question she was a minor.

discussion of the sexual acts they engaged in when he visited her in the Philippines in 2018. A photograph sent from MV-1's Facebook account depicted them together on a hotel bed (fully clothed). A copy of MV-1's Philippine birth certificate revealed that she was 14 years old in February 2018 when Fuchs had sex with her.[2] Fuchs was interviewed at O'Hare airport in July 2019, as he was about to embark on another trip to the Philippines. Initially during that interview, Fuchs readily acknowledged that MV-1 was a minor, but he denied having anything but a platonic, beneficent relationship with her. Once the agents confronted him with the evidence they had gathered, however, Fuchs acknowledged that the agents could establish he had had a sexual relationship with MV-1.

Fuchs was charged with three separate offenses based on his sexual activity with MV-1: using a facility or means of foreign commerce to coerce or entice a minor to engage in criminal sexual activity (18 U.S.C. § 2422(b)); traveling in foreign commerce with the intent to engage in illicit sexual conduct, which is defined to include engaging in sexual activity with a minor (18 U.S.C. § 2423(b)); and traveling to and engaging in illicit conduct in a foreign country (18 U.S.C. § 2423(c)).

Fuchs waived his right to a jury and the case was tried to the bench. One of the contested issues at trial was the admissibility of a copy of MV-1's Philippine birth certificate, which indicated that she was born in March 2003 and thus was 14 years old when Fuchs had sex with her. Although MV-1 did not testify (she declined to cooperate with the government's

---

[2] The district judge's written findings indicate that MV-1 was 15 years old at that time, but having been born in March 2003, she would have been just shy of 15 years old in February 2018.

investigation), the district court admitted into evidence an affidavit from her indicating that she was actually born in 1999 and not 2003, as the birth certificate obtained by HSI indicated. MV-1 averred that she had paid a "fixer" to alter the date of birth on the certificate so that she could qualify for a free college program available only to high school students. R. 56-1. If in fact she had been born in 1999, she would have been 18 years old at the time Fuchs had sex with her in 2018. The defense did not introduce evidence of an unaltered birth certificate confirming MV-1's story. It did, however, argue that the government had not supplied sufficient proof as to the authenticity of its copy of MV-1's birth certificate and opposed admission on that ground. The court overruled the defense objection and admitted the birth certificate into evidence.

Apart from MV-1's birth certificate, the government's evidence against Fuchs included his Facebook messages,[3] a recording of the airport interview, records related to Fuchs's 2018 trip to the Philippines, and records of payments totaling in excess of $2,000 that Fuchs had made to MV-1 via PayPal and its affiliate, Xoom, after that trip to the Philippines.

In a written order, the district judge found Fuchs guilty as charged, deeming the evidence (including the copy of the birth certificate) sufficient to establish, among other points, that MV-1 was a minor at the time Fuchs had sex with her, that he believed her to be a minor, and that he traveled to the Philippines in February 2018 with the intent to have sex with

---

[3] The corresponding messages from MV-1's Facebook account, which MV-1 did not confirm were written by her, were admitted into evidence for the limited purpose of supplying context for Fuchs's own messages.

her. R. 84. The judge ordered Fuchs to serve a below-Guide-
lines sentence of 126 months in prison.

## II.

Fuchs pursues three issues on appeal: the admissibility of
MV-1's birth certificate, the admissibility of a digital copy of
his recorded interview at the airport in 2019, and the suffi-
ciency of the evidence to convict him of the charged offenses.

A. *Authenticity and admissibility of Philippines birth certificate.*

HSI investigator Edwin Roble, using MV-1's name and
that of her mother (which he obtained from MV-1's Facebook
account), ordered a copy of MV-1's birth certificate from the
Philippine Statistics Authority ("PSA"), which among other
functions serves as a national repository of birth, marriage,
death, and other public records. Roble appeared in person at
the Authority to pick up the birth certificate along with an at-
testation of authenticity digitally signed by Marizza B.
Grande, an Assistant National Statistician employed by the
PSA, acting in her capacity as Officer in Charge. Concur-
rently, the government obtained duplicates of the same birth
certificate and attestation of authenticity obtained by Agent
Roble through the U.S. embassy in Manila. The duplicates
were produced under the cover of a letter addressed to an of-
ficial at the U.S. Department of Justice, Criminal Division, and
signed by an unidentified individual on behalf of George O.
Ortha II, Chief State Counsel with the Philippines Department
of Justice. In relevant part, the letter states that "transmitted
herewith is the copy of the Certificate of Live Birth of [MV-1]
provided by the Philippine Statistics Authority (PSA) and ac-
companied by the duly accomplished 'Attestation of Authen-
ticity of Foreign Public Documents,' issued on 14 March 2022

by Ms. Marizza B. Grande, OIC Assistant National Statistician, Civil Registration Service, PSA."[4] Collectively, these documents comprised the government's trial exhibit 46, which the government offered into evidence pursuant to Federal Rule of Evidence 902(3) as proof of MV-1's March 2003 birthdate. As noted, the district court admitted the exhibit into evidence over Fuchs's objection.

The district court is accorded broad discretion in resolving evidentiary questions, and our review is commensurately deferential: we will disturb the district court's ruling only if the court abused that discretion. *E.g.*, *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008); *United States v. Taylor*, 701 F.3d 1166, 1172 (7th Cir. 2012). Put another way, we will reverse only if no reasonable person could take the position adopted by the district court. *E.g.*, *United States v. Cox*, 54 F.4th 502, 514 (7th Cir. 2022), *cert. denied*, 144 S. Ct. 206 (2023).

Rule 902 of the Federal Rules of Evidence sets forth the requirements for the admission of self-authenticating documents, that is, documents that do not require extrinsic evidence of their authenticity, as a business record would under Rule 803(6), for example. *United States v. Deverso*, 518 F.3d 1250, 1256 (11th Cir. 2008). *Cf. United States v. Reese*, 666 F.3d 1007, 1017 (7th Cir. 2012) (summarizing foundation testimony required for admission of business record). Rule 902(3) addresses foreign public documents:

---

[4] Originally, the government offered an emailed copy of the Ortha letter into evidence. After the defense raised doubts as to the sufficiency of a copy over the original, the government obtained and produced the original letter with the "wet," i.e., ink, signature executed on Ortha's behalf.

**Foreign Public Documents.**

A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester—or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either:

> (A) order that it be treated as presumptively authentic without final certification; or

> (B) allow it to be evidenced by an attested summary with or without final certification.

Fed. R. Evid. 902(3). Separately, Rule 902(4) in relevant part authorizes the admission of "[a] copy of an official record—or a copy of a document that was recorded or filed in a public office as authorized by law—if the copy is certified as correct by … a certificate that complies with Rule 902(1), (2), or (3) … ." Fed. R. Evid. 902(4)(B). Thus, a certification that complies

with Rule 902(3) will suffice to support the admission of a copy of a foreign public document. *See also* Fed. R. Civ. P. 44(a)(2) (foreign record may be evidenced by the record, or a copy of the record, attested to by an authorized person and accompanied by a certification confirming the genuineness of the signature and official position of the person making the attestation); Fed. R. Crim. P. 27 (party may prove an official record in the same manner as in a civil action).

In substance, Rule 902(3) imposes two conditions on treating a foreign public document as self-authenticating. "First, there must be some indication that the *document* is what it purports to be. Thus, the proffered document must be executed by a proper official in his official capacity, or the genuineness of the document must be attested to by a proper official in his official capacity." *United States v. Squillacote*, 221 F.3d 542, 562 (4th Cir. 2000) (emphasis in original); *accord Deverso*, 518 F.3d at 1256. "Second, there must be some indication that the *official* vouching for the document is who he purports to be." *Squillacote*, 221 F.3d at 562 (emphasis in original); *Deverso*, 518 F.3d at 1256.

The copy of the birth certificate and the accompanying attestation obtained by Investigator Roble meet the first of these requirements. Both sides of the reproduced birth certificate bear the stamped seal of the Philippine Statistics Authority and the stamped signature of Dr. Dennis Mapa, the National Statistician and Civil Registrar General of the Philippine Statistics Authority. Accompanying the birth certificate is an attestation completed and digitally signed by Assistant National Statistician Marizza Grande, acting in her capacity as Officer in Charge. The attestation represents that the attached copy of the birth certificate, which it identifies as the birth

certificate of MV-1, is a true and accurate copy of the original on file with the Philippine Statistics Authority. Grande's digital signature is accompanied by a date and time stamp. Grande's attestation suffices as an indication that the photocopy is what it purports to be: a genuine reproduction of MV-1's original birth certificate.

Fuchs emphasizes that Grande's signature is a digital signature rather than a "wet" signature executed in ink by Grande's hand, but we do not regard this by itself undermining the validity of her certification. Facsimile signatures have long been recognized as valid and authoritative in any number of contexts. *See Roberts v. Johnson*, 212 F.2d 672, 674 (10th Cir. 1954) ("The law is settled that a printed name upon an instrument with the intention that it should be the signature of the person is valid and has the same force and effect as though the name were written in the person's own handwriting.") (collecting cases); *see also, e.g., General Movers, Inc. v. Jernberg Forging Co.*, 516 F.2d 1341, 1343 (7th Cir. 1975) (pre-printed name of company as consignor in space indicated on bill of lading for invocation of non-recourse clause); *Hill v. United States*, 288 F. 192, 193 (7th Cir. 1923) (facsimile signatures of Federal Reserve Bank president and cashier on one-dollar bank note); *Joseph Denunzio Fruit Co. v. Crane*, 79 F. Supp. 117, 128–29 (S.D. Cal. 1948) (exchange of teletype messages regarding terms of sale agreement in lieu of signed contract); *McKee v. Vernon Cnty.*, 16 F. Cas. 188, 189 (W.D. Mo. 1874) (lithographic signatures of presiding justice and county clerk on bonds issued by county court); *State v. Watts*, 222 S.E.2d 389, 391–92 (N.C. 1976) (mechanically reproduced signature of motor vehicles division officer attesting to authenticity of records of defendants' convictions for motor vehicle offenses); *Commonwealth v. Ballard*, 331 A.2d 578, 580 (Pa.

Commw. Ct. 1975) (stamped signature of traffic court judge on report of traffic conviction). Fuchs gives us no reason to question the authenticity and sufficiency of the digital signature here. We may presume that Grande intended for the digital reproduction to serve as her signature, as if she had signed the attestation in ink with her own hand. *Watts*, 222 S.E.2d at 392.

Fuchs also suggests that the attestation is insufficient because the government offered into evidence only a copy of the attestation, rather than the original that was produced to Investigator Roble at the Philippine Statistics Authority. *See* 31 Charles A. Wright & Victor J. Gold, FEDERAL PRACTICE & PROC. § 7138 (updated through June 2024) (discussing requirements for self-authentication of copies of public records: "[W]hile Rule 902(4) recognizes that a copy of a public record can be self-authenticating, the certificate required by that provision must be an original to comply with Rules 902(1), (2), or (3). Thus, a 'copy of a certified copy' cannot satisfy Rule 902(4).") (footnotes omitted). Although producing the original would have been the better practice, Fuchs does not explain why, in this instance, a duplicate of Grande's attestation does not suffice. After all, Roble was shown that duplicate along with MV-1's birth certificate at trial, and he identified those documents as the ones produced to him by the Philippine Statistics Authority. And, of course, the Ortha letter (which *was* an original) enclosed a duplicate of the very same attestation. So there would appear to be little chance that the Grande attestation was a forgery (or that Fuchs was deprived of a reasonable opportunity to investigate the authenticity of the attestation, including Grande's digital signature). Fuchs's mere observation that this was a duplicate rather than an

original does not convince us that the attestation was insufficient and inadmissible.

Whether the documentation satisfies the second condition of the rule is a closer question. What the rule envisions is a final certification from an appropriate U.S. or Philippines official verifying that the individual who attested to the authenticity of the document—in this case, Marizza Grande—is who she purports to be. Ortha's letter makes no direct, express representation as to Grande's position in the National Statistician's Office or her authority to vouch for the authenticity of the copy of MV-1's birth certificate. *Cf. Deverso*, 518 F.3d at 1256 ("The copy of Beverly's birth certificate was accompanied by a certificate from Richard Ambrad, Embassy Coordinator with the Government of the Philippines, attesting that the copy of Beverly's birth certificate was a true copy of an official record authorized by the law of the Philippines to be reported and recorded in the National Census and Statistics Office. That certification was accompanied by a final certification by Kimberly A. Russell, Vice Consul of the United States in the Philippines. Additionally, the copy of the birth certificate was stamped as a certified copy and affixed with the seal of Luzviminda N. Cruz, whom Vice Consul Russell certified was 'Clerk II, National Statistics Office, Quezon City, Republic of the Philippines.'"); *United States v. Doyle*, 130 F.3d 523, 544 (2d Cir. 1997) ("The evidence in question … was attested to as authentic by a Senior Inspector in the Customs Department whose signature was verified by the Deputy Attorney General of the Republic of Malta."); *United States v. Maxwell*, 516 F. App'x 816, 820 (11th Cir. 2013) (non-precedential decision) ("Maxwell's certified birth certificate was accompanied by a final certification from Jamaica's Director of Passport Services"); *United States v. Medrano*, 356 F. App'x 102, 109 (10th

Cir. 2009) (non-precedential decision) ("Defendant's birth certificate was executed by a person authorized by Mexican laws to execute birth certificates, and it was accompanied by a certification from a United States Vice-Consul that the person who executed it was authorized to do so."). But considering the purpose and context of Ortha's letter, which enclosed duplicates of both MV-1's birth certificate and what the letter described as Grande's "duly authorized" attestation of authenticity, one might plausibly construe the letter as an implicit certification that the Philippines Statistics Authority is the official repository of Philippine birth certificates and that Grande is in fact an Assistant National Statistician with the power to execute the attestation.

In a sense, Ortha's letter is the equivalent of Agent Roble's testimony recounting how he obtained a certified copy of the birth certificate. The document did not appear out of thin air: Roble described ordering the certificate from the Philippine Statistics Authority, where such documents are collected and stored, appearing in person at the Authority's office, and receiving the birth certificate and Grande's attestation, copies of which were offered into evidence at trial. Roble obviously could not speak to Grande's authority, but his testimony gives us some reason to believe that the copy of the birth certificate he obtained from the Authority was genuine.

There is also a secondary question as to whether Ortha, as "Chief State Counsel" with the Philippines Department of Justice, falls within one of the categories of foreign officials that Rule 902(3) identifies as authorized to provide the type of

certification that the rule requires. Fuchs raises this question but the government's brief does not answer it.[5]

Any shortcomings in Ortha's letter are not fatal to the admissibility of the birth certificate, however. The rule provides that "[i]f all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, … (A) order that it be treated as presumptively authentic without final certification … ." That is precisely what the district court did here. R. 135 at 141.

There is no dispute that Fuchs had an adequate opportunity to investigate the authenticity of the copy of MV-1's birth certificate (it was disclosed to the defense well in advance of trial), and apart from MV-1's affidavit averring that the birth certificate was altered, the defense offered the court no reason to believe that the copy of the birth certificate produced by the government was not genuine. Neither MV-1 nor the defense produced a birth certificate reflecting a 1999 birth date, nor (as the district court noted) did MV-1 explain how the "fixer" she allegedly engaged to alter her birth certificate could have replaced the original on file with the Philippine Statistics Authority with a purportedly altered, fraudulent birth certificate. R. 135 at 148. MV-1 did not cooperate with the government's investigation and did not testify, so she was never subject to cross-examination on such points. Although the court admitted her affidavit into evidence, when it relied on the birth certificate as proof that MV-1 was underage, the

---

[5] The letter indicates that it was produced "thru" a named Department of Justice attaché at the U.S. embassy in Manila. It is possible that the attaché himself might qualify as an embassy or consular official that the rule authorizes to make the requisite certification. The briefing does not address this issue either.

court obviously found the affidavit to be of insufficient weight to overcome the presumption that the birth certificate produced by the government was authentic and reliable. The court did not abuse its wide discretion in admitting the birth certificate into evidence.

Alternatively, we are satisfied that any potential error in admitting the birth certificate was harmless. MV-1's status as a minor was confirmed by ample evidence, including the recording of Fuchs's interview at O'Hare and his Facebook messages acknowledging that MV-1 was a minor in February 2018 when he met and had sex with her in the Philippines.[6]

B.  *Admission of Fuchs's recorded statement to government agent.*

Fuchs argues that the district court erred in admitting into evidence a digital copy of the recording of his interview with

---

[6] We add that even if the evidence was insufficient to establish MV-1's age beyond a reasonable doubt, Fuchs's belief that MV-1 was a minor (of which there was ample proof) would suffice to support a conviction under section 2422(b) for *attempting* to use a facility or means of foreign commerce to coerce or entice a minor to engage in sexual activity. *See United States v. York*, 48 F.4th 494, 501 (7th Cir. 2022). Likewise, Fuchs's belief that MV-1 was a minor would support his conviction under section 2423(b), as the crux of that offense is travel in foreign commerce with the *purpose* of engaging in sexual activity with a minor; "[t]he actual age of the intended victim is not an element of the offense[.]" *United States v. Tykarsky*, 446 F.3d 458, 469 (3d Cir. 2006); *see also United States v. Lieu*, 963 F.3d 122, 127 (D.C. Cir. 2020) (putative minor victim need not even exist in fact) (collecting cases). By contrast, the charge under section 2423(c) requires proof that Fuchs engaged in sexual conduct with a minor while in a foreign country, so the age of the victim is an element of that offense. *See United States v. Schmidt*, 845 F.3d 153, 156 (4th Cir. 2017); *United States v. Frank*, 599 F.3d 1221, 1232–33 (11th Cir. 2010); Wm. J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit, at 990 (2023) (pattern instruction for section 2423(c) offense).

government agents at O'Hare, but he waived this argument. In his response to the government's trial memorandum, Fuchs acknowledged that "Fuchs'[s] statements to law enforcement are admissible evidence." R. 76 at 5. More to the point, when the government's counsel at trial inquired of the court whether the recording of the interview had been admitted into evidence, Fuchs's counsel twice said that the defense had no objection to the admission of the recording. R. 135 at 85. This was not an oversight: Fuchs's counsel considered the admissibility of the recording and expressly acknowledged that it was admissible.

Fuchs all but concedes the waiver in his reply brief, but he argues that he was not personally consulted by his counsel on this point. But Fuchs was represented by counsel at trial, and his counsel expressly stated there was no objection to the admissibility of the recording. Fuchs is charged with the decisions of his counsel regarding the conduct of the trial, including decisions as to evidentiary objections. *See New York v. Hill*, 528 U.S. 110, 114–15 (2000); *United States v. Clark*, 535 F.3d 571, 577–78 (7th Cir. 2008). This was a valid and enforceable waiver.

And for what it is worth, Fuchs raises no more than the abstract possibility that a recording can be tampered with. He gives us no reason to believe that any tampering may have actually happened in this case. If the recording was altered or incomplete, Fuchs was in a position to know that as one of the two people participating in the recorded interview, so we can expect that he would have made a record in this regard. He did not.

*C. Sufficiency of the evidence.*

Finally, Fuchs contends that the district court erred in denying his motion for a judgment of acquittal; he believes the evidence was insufficient to establish his guilt. But Fuchs's challenge to the sufficiency of the evidence rests wholly on his contention that the requirements for self-authentication of the copy of MV-1's birth certificate were not satisfied and that the district court erred in admitting the birth certificate into evidence, thus leaving the record devoid of proof that MV-1 was a minor. We have resolved Fuchs's argument as to the admissibility of the birth certificate against him, and the birth certificate, along with the other evidence in the record, amply established that MV-1 was a minor. The evidence was sufficient to establish Fuchs's guilt beyond a reasonable doubt.

## III.

For the foregoing reasons, we AFFIRM Fuchs's conviction.